904 So.2d 551 (2005)
Pamela GRUNOW, individually, as Personal Representative of the Estate of Barry Grunow, deceased, and as Next Friend and Natural Guardian of Samuel Grunow, a minor, and Lee-Anne Grunow, a minor, Appellant,
v.
VALOR CORPORATION OF FLORIDA, a Florida corporation, Appellee.
No. 4D03-717.
District Court of Appeal of Florida, Fourth District.
June 1, 2005.
Montgomery & Larson, LLP, and Edna L. Caruso of Edna L. Caruso, P.A., West Palm Beach, for appellant.
*553 John Renzulli of Renzulli, Pisciotti & Renzulli, LLP, New York, NY; Thomas E. Warner, Wendy F. Lumish, Joseph Ianno, Jr., and Jeffrey A. Cohen of Carlton Fields, P.A., West Palm Beach, for appellee.
*552 POLEN, J.
Appellant, Pamela Grunow, as personal representative of the estate of Barry Grunow, appeals the trial court's entry of a final judgment notwithstanding the verdict, on the basis of an inconsistent verdict. We find no inconsistency in the verdict itself, however, we affirm for the reasons that follow under the "tipsy coachmen" doctrine. See State Farm Fire and Cas. Co. v. Levine, 837 So.2d 363, 365 (Fla. 2002).
The material facts of this case are undisputed. See Brazill v. State, 845 So.2d 282, 285-86 (Fla. 4th DCA 2003). Nathaniel Brazill had been suspended from school on the last day of the school year for a water balloon fight. Brazill went home to retrieve a gun that he had taken from his grandfather's bedroom the previous week with the intent of returning to school and shooting his school counselor. The grandfather inherited the gun from a deceased friend who had purchased the gun legally. When Brazill arrived at school, he proceeded to teacher Barry Grunow's classroom to speak with two friends. When Barry Grunow refused to allow the two students to exit the classroom to speak with Brazill, Brazill pulled out the gun, aimed it at his head, fired, and killed him. Brazill was arrested and eventually found guilty of second degree murder. At Brazill's trial, a firearms expert with the FBI testified that the gun used in the shooting functioned normally and would not discharge unless the trigger was pulled.
Following the criminal trial, Pamela Grunow, the wife of Barry Grunow, filed this wrongful death suit against Valor Corporation of Florida.[1] For purposes of this appeal, Grunow's claim was that Valor, as the gun distributor responsible for the Raven MP-25 "Saturday Night Special"[2] that Brazill used, should be liable for failing to implement feasible safety mechanisms such as external locks and/or lock boxes, which could have significantly reduced the potential for unauthorized use by a child and/or in criminal activity.
Valor is a wholesale distributor of outdoor sporting goods, which does not manufacture guns nor does it add anything to or subtract anything from the finished retail product. Valor only sells guns to federally licensed firearms dealers. Likewise, the Raven MP-25 that Brazill used was legally sold to the Hypoluxo Pawn Shop, which in turn legally sold it to Herbert Jones, whose widow gave it to Brazill's grandfather. Nevertheless, Grunow asserts that Valor knew or should have known that at the time it sold the Raven that children obtain access to guns and that it was foreseeable that children would commit violent crimes with the guns that Valor sold.
At the conclusion of Grunow's case and again at the end of the ten week trial, Valor unsuccessfully moved for a directed *554 verdict arguing that it had no duty to act as a reasonably prudent distributor when selling a nondefective product. The jury ultimately returned a verdict in which it found the Raven MP-25 was not defective or unreasonably dangerous, but that Valor was negligent for failing to supply the gun with feasible safety measures.[3] The jury apportioned Valor's fault to be five percent in awarding the estate $35,000, the widow $10,000,000 and each child $7,000,000.[4]
Post-trial, the trial court entered an order granting Valor's Motion for Judgment Notwithstanding the Verdict, finding the verdict to be inconsistent. Again, we find no inconsistency in the verdict itself; however, we affirm because the trial court's order reached the correct result for the wrong reason. See Levine, 837 So.2d at 365. That is to say, Florida does not recognize a cause of action for negligent distribution of a non-defective firearm, i.e., there can be no liability on behalf of Valor in this instance.
As of yet, no Florida court has recognized a duty for a gun distributor to reasonably and prudently distribute a non-defective gun. Notwithstanding, Grunow argues that Florida law could impose such a duty. However, Grunow's primary manner of persuasion is to distinguish the cases which are contrary to her position, primarily Coulson v. DeAngelo, 493 So.2d 98, 99 (Fla. 4th DCA 1986), Trespalacios v. Valor Corp. of Florida, 486 So.2d 649 (Fla. 3d DCA 1986) and Shipman v. Jennings Firearms, Inc., 791 F.2d 1532 (11th Cir. 1986).
In Coulson, this court held that a gun manufacturer was not strictly liable for injuries to a shooting victim where the gun itself was not defective, but rather, the plaintiff's allegations were that the use of the gun made it defective. While Coulson is easily distinguishable because there was no claim for negligence, Trespalacios and Shipman are more on point. In Trespalacios, negligence actions were brought by survivors of individuals killed against the seller, distributor and manufacturer of a recently purchased "riot and combat" shotgun which was used in criminal activity. The third district held:
For the reasons that the firearm was not defective, see Bennet v. Cincinnati Checker Cab Co., 353 F.Supp. 1206 (E.D.Ky.1973); that manufacture or distribution of the weapon is not unlawful pursuant to either state law or the federal Gun Control Act of 1968, 18 U.S.C. §§ 921-928 (1982), see Linton v. Smith & Wesson, 127 Ill.App.3d 676, 82 Ill.Dec. 805, 806, 469 N.E.2d 339, 340 (1984); and that neither the manufacturer nor distributor had a duty to prevent the sale of handguns to persons who are likely to cause harm to the public, see Riordan v. International Armament Corp., 132 Ill.App.3d 642, 87 Ill.Dec. 765, 477 N.E.2d 1293 (1985); *555 Linton; cf. K-Mart Enterprises of Florida, Inc. v. Keller, 439 So.2d 283 (Fla. 3d DCA 1983) (retailer held liable when firearm sold to person who was unlawful user of marijuana and subject of felony information, in violation of federal Gun Control Act, was criminally misused), rev. denied, 450 So.2d 487 (Fla.1984), there was no duty which had been breached by the manufacturer and distributor so as to support a cause of action based on negligence. See Bennet.

486 So.2d at 650-51 (emphasis added). Likewise, the Eleventh Circuit, relying exclusively on Trespalacios, held that under Florida law, a gun distributor of a Saturday Night Special that was used in a criminal act was not liable to a decedent's estate for negligence, despite claims that the distributor failed to exercise reasonable care in marketing its weapons by distributing the guns to persons without regard for their possible misuse by buyers. Shipman, 791 F.2d at 1533-34.
Grunow attempts to distinguish Trespalacios and Shipman by arguing that the claim in those cases was that a gun distributor had a duty to prevent the sale of handguns to persons likely to use them in criminal activity, whereas in the case at bar, Grunow asserts that a gun distributor has a duty to sell its guns with reasonable safety measures. However, Grunow's characterization of her claim is but a portion of her actual claim. The full extent of Grunow's claim is that a gun distributor has a duty to sell its guns with reasonable safety measures that would tend to limit the possibility that its guns will end up in the hands of unauthorized persons likely to use them in criminal activity.[5] We are unpersuaded by this argument because if Grunow were correct in distinguishing between these duties, the result would be illogical. That is, a gun distributor could not be found negligent for selling a gun directly to a criminal as long as the gun was sold with an additional reasonable safety measure to limit the possibility that the gun could end up in the hands of some other unauthorized criminal. However, a gun distributor which makes sure that it is not selling its guns to criminals may be negligent for failing to include an additional reasonable safety measure to limit the possibility that the gun could end up in the hands of any unauthorized criminal. In other words, a gun distributor should not have a duty to prevent indirectly that which it is permitted to do directly.
Grunow next approaches the issue from a different perspective. Grunow concedes that there is no duty to prevent the misconduct of a third party absent a special relationship. See Trianon Park Condominium Ass'n, Inc. v. City of Hialeah, 468 So.2d 912, 918 (Fla.1985). However, Grunow asserts that Brazill's conduct, which she argues was foreseeable, did in fact give rise to a special relationship, and therefore a duty, resulting out of Valor's affirmative acts. Contrarily, Valor argues that there was no special relationship and furthermore that Brazill's unforeseeable criminal act, eleven years after the gun was legally sold, was the intervening and legal cause of Grunow's damages. See Everett v. Carter, 490 So.2d 193 (Fla. 2d DCA 1986) (holding homicide by handgun which occurred six weeks after delivery of handgun in violation of federal statute that prohibits federally licensed firearm dealer from selling or delivering handgun to person under 21 years of age and which was committed by perpetrator who broke no *556 state or federal law by possessing handgun was not within realm of reasonable foreseeability on part of dealer and, therefore, was independent intervening cause that broke chain of causation between illegal delivery of handgun and death). We find no special relationship here between Valor and either Brazill or Grunow. See K.M. v. Publix Super Mkts., Inc., 895 So.2d 1114, 1117-18 (Fla. 4th DCA 2005) (holding a special relationship arises from an actual relationship between the party upon whom a duty is imposed and either the criminal actor who should be controlled or the victim who is entitled to protection); Restatement (Second) of Torts, §§ 314A, 315-320. Further, we do not find Brazill's criminal conduct to be a foreseeable event which Valor should have expected. Nevertheless, foreseeability is not the decisive factor.
While McCain v. Florida Power Corp., 593 So.2d 500 (Fla.1992), and its progeny hold that "the duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader `zone of risk' that poses a general threat of harm to others," Grunow has failed to bring this court's attention to any case which applies this proposition in a product liability context. We distinguish McCain on that basis, and, in the arena of product liability, adopt the reasoning of Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222, 727 N.Y.S.2d 7, 12-13, 750 N.E.2d 1055 (2001) (citations omitted), which held:
[f]oreseeability, alone, does not define dutyit merely determines the scope of the duty once it is determined to exist. The injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her, for without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm. That is required in order to avoid subjecting an actor to limitless liability to an indeterminate class of persons conceivably injured by any negligence in that act. Moreover, any extension of the scope of duty must be tailored to reflect accurately the extent that its social benefits outweigh its costs.[6]
To hold otherwise would make a manufacturer or distributor an insurer of its product. See Houdaille Indus., Inc. v. Edwards, 374 So.2d 490, 493 (Fla.1979) ("A manufacturer, although liable for injuries caused by a defect in its product, is not an insurer for all physical injuries caused by its product."); West v. Caterpillar Tractor Co., 336 So.2d 80 (Fla.1976).
Products liability does not make the manufacturer an insurer of all foreseeable accidents which involve its product. Virtually any product is capable of producing injury when put to certain uses or misuses.... [T]he availability of an alternative design does not translate into a legal duty in products liability. An action is not maintainable in products liability merely because the design used was not the safest possible.
Husky Indus., Inc. v. Black, 434 So.2d 988, 991 (Fla. 4th DCA 1983) (citing Hunt v. Blasius, 74 Ill.2d 203, 23 Ill.Dec. 574, 384 N.E.2d 368, 372 (1978)).
Consequently, under the facts of this case, we find that there was no cause of action in negligence which could be sustained under Florida law. We certainly sympathize with Grunow and recognize the tragedy of the events that transpired. However, it was Brazill, his grandfather, and perhaps the school that were liable, *557 not Valor. While Grunow's proposed theory of duty may sound reasonable, the legislature is better suited and can more appropriately address this issue, which would necessarily include a societal cost/benefit analysis. Nevertheless, although the trial court entered a Judgment Notwithstanding the Verdict for the incorrect reason, the ultimate result, holding that Valor cannot be held negligent for the distribution of the non-defective Raven MP-25 handgun, was correct and is therefore affirmed.
Affirmed.
STEVENSON and GROSS, JJ., concur.
NOTES
[1] Grunow also brought claims against other defendants, both product liability and non-product liability, but all other claims were settled prior to trial.
[2] The term "Saturday Night Special" originated in Detroit, where officials first noted the frequency with which these cheap, easily concealable handguns were used in crimes and violent acts which far too often mar the urban weekend. This term is generally used to describe a small, cheap handgun used in criminal activity. Kelley v. R.G. Indus., Inc., 304 Md. 124, 497 A.2d 1143, 1153 n. 8 (1985) (citations omitted). These guns are particularly susceptible to crime because they are affordable to obtain and thereafter discard.
[3] The jury answered the verdict form as follows:

1. Did [Valor] sell and supply an unreasonably dangerous and defective product which was a legal cause of damage to [Grunow]?: NO
2. Was there negligence on the part of [Valor] in supplying an unreasonably dangerous product which was a legal cause of damage to [Grunow]?: NO
3. Was the Raven handgun supplied by [Valor] defective and unreasonably dangerous because [Valor] did not include reasonable safety measures which was a legal cause of damage to [Grunow]?: NO
4. Was there negligence on the part of [Valor] in supplying the Raven MP-25 without feasible safety measures which was a legal cause of damage to [Grunow]?: YES.
[4] The jury found Brazill's grandfather legally responsible for 50% and the School Board of Palm Beach County responsible for 45% of Grunow's damages.
[5] The safety measures which Grunow suggested should have been implemented, i.e., a locked gun box or external gun lock, would not make the firing of the actual gun any safer, but rather would limit access to the gun by unauthorized users.
[6] Contra Ileto v. Glock Inc., 349 F.3d 1191 (9th Cir.2003) (holding under California law, gun distributor does have duty to act reasonably in distributing non-defective product).