980 So.2d 550 (2008)
L.A. FITNESS INTERNATIONAL, LLC, a Foreign Limited Liability Corporation d/b/a as L.A. Fitness Sports Clubs, and L.A. Fitness  Florida, Inc., a Florida corporation d/b/a L.A. Fitness Sports Clubs, Appellants,
v.
Julianna Tringali MAYER as Personal Representative of the Estate of Alessio Tringali, Deceased, Appellee.
No. 4D06-3038.
District Court of Appeal of Florida, Fourth District.
April 23, 2008.
*552 Scott A. Cole of Cole Scott & Kissane, P.A., Miami, for appellants.
Robert C. Buschel, Russell S. Adler and Jenessa M. Stearns of Rothstein Rosenfeldt Adler, Fort Lauderdale, for appellee.
TAYLOR, J.
Alessio Tringali died as a result of a cardiac arrest he suffered while using a stepping machine at L.A. Fitness in Oakland Park, Florida. His daughter, as personal representative of his estate, filed a wrongful death action against L.A. Fitness. She alleged that L.A. Fitness breached its duty to use reasonable care for the safety of the deceased, including the duty to render aid during a medical emergency. Specifically, the plaintiff asserted that L.A. Fitness: (1) failed to properly screen the deceased's health condition at or about the time he joined the health club; (2) failed to administer cardiopulmonary resuscitation (CPR) to him; (3) failed to have an automatic external defibrillator (AED) on its premises and to use it on the deceased; and (4) failed to properly train its employees and agents for handling medical emergencies. In this appeal from a judgment entered on a jury verdict for the estate, L.A. Fitness contends that it satisfied its duty to render assistance to the deceased as a matter of law when it promptly summoned professional medical assistance for him. We agree and reverse.

Background
Robert Strayer, an L.A. Fitness sales representative, testified that he was sitting at his desk at the Oakland Park L.A. Fitness around 9 p.m. on April 3, 2003 when he heard someone call for help. Strayer got up from his desk, told the receptionist to call 911, and ran to the back of the gym. Strayer observed Alessio Tringali lying on his back surrounded by L.A. Fitness patrons. According to Strayer, Tringali was bleeding from a cut on his head and shaking from small convulsions; his face was red, and yellow foam was coming from his mouth. Strayer, who was certified in CPR, believed Tringali was having a seizure or a stroke. He knelt down beside Tringali to assess his condition. Strayer first touched Tringali to determine if he was responsive. He then checked his left wrist and felt a faint pulse, which to him indicated a heartbeat. He also noted the red color of Tringali's face and concluded that Tringali had an oxygen supply. He did not, however, put his face next to Tringali to feel if he was breathing. Because Strayer believed Tringali had fallen off a nearby stepping machine and may have sustained a concussion to his head or hurt his neck or back, he did not perform a "chin tilt" to open his airway, which is one of the first steps in CPR. Based on his observations and belief that Tringali was having a seizure or stroke, Strayer decided not to attempt CPR and possibly make matters worse. He testified that Tringali had just begun to turn blue when the paramedics arrived. He estimated that *553 paramedics arrived within three to four minutes of the first cry for help.
Peter Bailey, the general manager of L.A. Fitness, was also at the facility that evening. He testified that he was sitting in the same area as Strayer and, when he heard a call for help, pointed to the front desk and instructed the receptionist to call 911. He told Strayer to stay with Tringali while he ran to the front of the facility to make sure the 911 call was placed. Bailey talked to the 911 operator, who asked him whether Tringali was breathing. He responded that he did not know and ran back to the scene to ask Strayer. Strayer told him that Tringali was, indeed, breathing. Bailey relayed this information to the 911 operator. Bailey estimated that four to six minutes elapsed between the time he heard the call for help and the paramedics arrived.
Three members of the facility provided testimony regarding their observations of the scene. George Basantes, a gym patron, testified that he saw Tringali fall from the stair climber and land on his back. He described Tringali as "gasping" for air. He said that the deceased turned blue within five minutes of collapsing. According to Basantes, no one administered CPR or attempted to get Tringali's vital signs. Instead, bystanders just encouraged him to breathe. Basantes testified on cross-examination that the L.A. Fitness employees merely sat and stared at the deceased. He estimated that ten to twelve minutes passed between the time Tringali collapsed and the paramedics arrived.
Gym patron Paul Orszulak observed Tringali stumble backward, fall off the machine, and land on his back and head. He shouted for help and ran over to Tringali. Orszulak testified that Tringali was not moving, although he appeared to be breathing. According to Orszulak, three to five minutes elapsed from the time Bailey left the scene to the time the paramedics arrived.
Gym patron Jeffrey Criswell testified to noticing Tringali lying on the ground by the stepping machines and seeing Bailey run to the scene and signal his staff to call 911. Criswell estimated that only two to four minutes elapsed between the time Bailey called 911 and the paramedics arrived.
Connie Wagaman, an EMT for the City of Oakland Park Fire Rescue, testified that she responded to L.A. Fitness with two other EMT's. Wagaman testified that Fire Rescue received a call from Fitness at 9:18 p.m., and that they arrived at Fitness at 9:21 p.m. Wagaman observed Tringali lying on his back with his head in someone's lap. Tringali was not breathing and did not have a pulse. EMS attached a valve mask with oxygen, performed CPR, and used a defibrillator to treat Tringali. Wagaman testified that EMS used CPR protocol to treat Tringali. Wagaman stated that EMS shocked the defendant at 9:21 p.m. and then again at 9:24 p.m. but were unable to re-establish a pulse.
Dr. Steven Van Camp, a cardiologist with a special interest in the hazards of exercise, was plaintiff's medical expert. Dr. Van Camp testified that the deceased's cause of death was hypertrophic cardiomyopathy. In Dr. Van Camp's opinion, Tringali's condition was treatable with defibrillation; however, if defibrillation was not possible, CPR could have been "used to increase the likelihood the [later] defibrillation would be successful and to preserve brain function." Dr. Van Camp explained that "CPR does not correct ventricular fibrillation by itself, but what it does, it prolongs the time for which effective defibrillation can be . . . administered." Dr. Van Camp testified that although EMS responded very quickly, the shocks administered were not effective because *554 CPR had not been timely and effectively administered.
Dr. Van Camp testified that the witnesses' accounts suggested that the deceased was not breathing. He noted Strayer's testimony that he did not see Tringali's chest rising and falling and Basantes' testimony that the deceased was blue and "gasping" for air. Dr. Van Camp explained that Tringali would not have turned blue if he had been breathing effectively. Although another gym patron testified that Tringali had "some chest activity," Dr. Van Camp believed that the patron described "agonal" or end-of-life breathing. However, Dr. Van Camp admitted on cross-examination that it is difficult for a lay person to distinguish "regular" breathing from "agonal" breathing if he has not been trained in CPR.
In Dr. Van Camp's opinion, if CPR had been administered before paramedics arrived, even in the absence of defibrillation by L.A. Fitness employees, there is a seventy-five percent or greater chance that Tringali would have been successfully resuscitated. Moreover, Tringali likely would have survived for twenty or twenty-five more years.
Dr. Max Harry Weil, a cardiologist, agreed that CPR extends the time in which defibrillation can be successfully administered. Dr. Weil testified that "if the defibrillator isn't immediately available, you give yourself a chance to extend the time window over which the defibrillator might be effective [by using CPR]. Put another way, that very sharp quoted three-minute interval is then extended to four, five or six [minutes]." Dr. Weil agreed that, more likely than not, Tringali would have been revived by paramedics if he had been given CPR by Fitness employees. He also concurred with Dr. Van Camp that a lay person could easily confuse gasping with breathing and shaking of the head, as observed by Strayer, with seizures.
Anthony Abbott, Ph.D., testified that Strayer was negligent by failing to follow CPR protocol and perform CPR on Tringali. Abbott, an exercise physiologist and president of Fitness Institute International, testified about the health club industry's standards of care in April 2003 and their recommendations for cardiac safety at such facilities. Abbott testified that L.A. Fitness violated the industry's standards of care by failing to have a written emergency plan and to employ qualified personnel for handling emergencies. He said that the standards promulgated by the industry's authorities, including the International Health and Racquet Sports Club Association (IHRSCA) and the American College of Sports Medicine, are directed at responding to cardiopulomonary emergencies because "when people exercise there's a radically increased chance of having a cardiovascular incident because of the increased stress that comes with exercise." Abbott testified that Fitness' plan was inadequate; an emergency plan "is designed to assign various roles to individuals and how they carry those roles out."
In addition to a written emergency plan, in 2003 IHRSCA required facilities to have qualified persons on duty. In Abbott's opinion, L.A. Fitness did not have a CPR-qualified person on duty when Tringali was injured. Abbott testified that Strayer was certified but not qualified in CPR and did not follow appropriate CPR protocol.
Abbott explained the CPR procedure. First, the responder must determine if the individual is responsive. If the individual does not respond, regardless of the reason, the responder must activate the emergency medical service system or call 911. Then, if the individual is not breathing, the responder must administer CPR. Abbott *555 noted that even though an individual has a heartbeat, his heart will stop if he is not breathing. After the responder determines that CPR is necessary, he must perform a chin lift to open the airway. The responder then puts his ear over the individual's mouth and nose to feel for air, and looks at the individual's chest for movement. Abbott noted that Strayer did not perform a chin lift; nor did he assume an appropriate position to note any chest movement. The responder must then ventilate the individual. After ventilating, the responder should determine whether the individual's heart is beating by looking for movement of the body and checking for a pulse at the carotid artery in the neck. Abbott noted that Strayer checked Tringali's pulse at his wrist, instead of his neck. If there is no pulse, the responder must then perform chest compressions. As the other medical experts testified, Abbott explained that CPR is important because it prolongs the time during which effective defibrillation can be performed.
Abbot testified that, in addition to failing to have a written emergency plan or qualified responders, L.A. Fitness fell below the industry's standards of care by failing to have an Automated External Defibrillator (AED) on its premises in April 2003. Abbott admitted that AEDs were not required by law in 2003 and that L.A. Fitness employees were not required by law to perform CPR or to have a written emergency plan. Abbot further testified that L.A. Fitness fell below the pertinent standards by failing to screen individuals prior to their commencing exercise and by failing to employ a medical liaison. Abbott admitted on cross-examination that he could not quantify the number of similar facilities that screened members. He further admitted that none of the deceased's doctors had detected his heart condition; however, Abbott believed that screening would have detected the risk factors that would have prompted the deceased to seek further medical evaluation.
Dr. Nicholas Fortuin, a cardiovascular disease and internal medicine specialist, testified for the defense. He said that individuals with undiagnosed hypertrophic cardiomyopathy are at greater risk of ventricular fibrillation during strenuous exercise than are other individuals. He further stated that the chances of recovery from cardiac arrest due to hypertrophic cardiomyopathy are much less than arrest caused by other heart diseases. He estimated Tringali's survival at less than 10 percent.
Dr. Fortuin further explained that he believed CPR is "extremely difficult to do successfully or adequately in the hypertrophic heart because it is a very thick heart." In Tringali's case, even if an AED had been used within the "average [time] for out-of-hospital arrests, which is five minutes," "more likely than not, he would not have been resuscitated because of the type and severity of his heart disease." He acknowledged that he only has anecdotal evidence that hypertrophes are more difficult to resuscitate.
In response to questions about Strayer's actions, Dr. Fortuin expressed his opinion that Strayer acted properly, stating:
I don't think that is true [that Strayer did not follow the proper protocol for assessing Tringali for CPR] because Mr. Strayer was making observations about the person. Now, you can argue whether they were correct or not, but he is not a trained medical person, first of all. Secondly, it is not uncommon in cardiac arrest for people to have seizures, so I don't even dispute the fact that he may well have been having a seizure at that point. All of us who have seen patients die like this know that some of the terminal events in the brain related to anoxia *556 may be seizure activity. So it is certainly possible that he did have a seizure.
Although Basantes and another patron did not describe seizure activity, Dr. Fortuin believed Strayer's observations to be more reliable because he was closest in proximity to Tringali and "was responsible for looking at the man and deciding what to do with him next." Dr. Fortuin testified that Strayer appropriately assessed Tringali, given his belief that Tringali was having a seizure.
Tringali's children and wife, Lenora Tringali, testified regarding the impact of his death. Lenora Tringali also testified about the L.A. Fitness membership agreement. She said that she did not read the membership contract before she signed it and listed her husband's name on it. She believed that both she and her husband were members; they exercised at L.A. Fitness three or four nights per week. They never had any problems with the facility.
Lenora testified that she did not believe that her husband was suffering from any medical problems when she signed the membership agreement. She did not believe either she or her husband underwent medical screening by L.A. Fitness prior to commencing their exercise regime. She agreed that by signing the contract, she represented to L.A. Fitness that she and her husband, the "members," were in good physical condition and had consulted a physician. She admitted that they did not consult a doctor prior to exercising at L.A. Fitness and that she "probably" did not expect L.A. Fitness to examine her husband. Bernard Pettingill, Jr., an economist, provided testimony regarding the value of the husband's support and services. He concluded that between $731,420 and $758,910 would be needed to contribute to the wife's support.
After both sides rested, the jury returned a verdict finding that Tringali's death was caused by the negligence of L.A. Fitness (85 percent) as well as the deceased (15 percent). The jury awarded Lenora Tringali $100,000 for lost support and services in the past, and $300,000 for future support and services. The jury further awarded the wife $100,000 for pain and suffering in the past and $200,000 for future pain and suffering. Alessio Tringali, the son, was awarded $25,000 for past pain and suffering. Total damages awarded were $729,000. Following the verdict, the court denied Fitness' motion for entry of judgment, or for a new trial, or remittitur. The court entered a final judgment for the plaintiff for $619,650. L.A. Fitness appealed from the judgment. Appellee cross-appealed, contending that the trial court erroneously instructed the jury on comparative negligence.
This appeal raises a question concerning the duty a health club or gym owes to a patron who is injured while exercising on its premises. L.A. Fitness argues that the trial court erred in not directing a verdict as a matter of law in its favor because it did not breach its duty of reasonable care to Alessio Tringali. Both parties recognize that a "special relationship" existed between L.A. Fitness and its members, and that, as with any business owner, L.A. Fitness had a duty to use reasonable care in rendering aid to Tringali when he became ill or injured. The parties disagree, however, as to the nature and extent of the duty owed the deceased and whether L.A. Fitness breached that duty.

CPR
It is well settled that if a legal duty exists, a defendant must exercise reasonable care under the circumstances. See Gross v. Sand & Sea Homeowners Ass'n, 756 So.2d 1073 (Fla. 4th DCA 2000). *557 In a negligence action, whether a defendant exercised reasonable care under a given set of facts is generally an issue for the jury to decide. See Whitt v. Silverman, 788 So.2d 210, 220 (Fla.2001). For that reason, appellee urges us to affirm the judgment entered in her favor. She argues that the jury's verdict shows that the jury agreed with her expert's testimony that L.A. Fitness's employee, Strayer, was negligent in failing to follow protocol for CPR assessment and in failing to administer CPR to Tringali.
Although the issue of whether a defendant exercised reasonable care is generally a jury question, whether a "duty of care" exists is a question of law to be determined solely by the court. Marriott, Int'l, Inc. v. Perez-Melendez, 855 So.2d 624, 628 (Fla. 5th DCA 2003). Here, in denying appellant's motion for directed verdict, the trial court determined the duty of care owed the deceased under the facts presented in this case. We review that legal determination de novo.
The issue of the duty owed by a health club owner to an injured patron appears to be a case of first impression for our courts. Neither party has provided us with any statutory or case law in Florida that clearly delineates the duties owed by a health club or gym to patrons facing a medical emergency. L.A. Fitness, however, cites three Florida cases which, it contends, establish its common law duty: Grunow v. Valor Corp. of Florida, 904 So.2d 551 (Fla. 4th DCA 2005); Coccarello v. Round Table of Coral Gables, Inc., 421 So.2d 194, 195 (Fla. 3rd DCA 1982), and Starling v. Fisherman's Pier, Inc., 401 So.2d 1136 (Fla. 4th DCA 1981).
In Starling, a customer who was "passed-out drunk" was left alone lying near the ocean on a commercial fishing pier. He rolled over into the water and drowned. His estate sued the pier operator for negligence. In reversing the trial court's dismissal of the complaint, we stated that "[A] proprietor simply cannot ignore and step over an unconscious customer lying in a dangerous place upon his premises and he must take some minimal steps to safeguard any customer upon his premises from extreme danger, even though the customer has allowed himself to be exposed to that danger in the first place." Starling, 401 So.2d at 1138. We agreed with the principle espoused in a West Virginia case and the Restatement of Torts (Second) § 314A "that a proprietor is under an ordinary duty of care to render aid to an invitee after he knows or has reason to know the invitee is ill or injured."[1] In Starling, we also noted comment (f) to the Restatement (Second) of Torts § 314A:
f. The defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured. He is not required to take any action beyond that which is reasonable under the circumstances. In the case of an ill or injured person, he will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained. He is not required to give any aid to one who is in the hands of apparently competent persons who have taken charge of him, or whose friends are present and apparently in a position to give him all necessary assistance.
Id. at 1137 n. 2.
L.A. Fitness argues that it met the standard enunciated in Starling. Their employees, *558 Strayer and Bailey, immediately advised their staff to call 911 when they heard a call for help and then quickly ran over to Tringali to check his condition. Strayer felt his wrist, noted his breathing patterns and heartbeat, saw the head cut, noted his position on his back, observed his facial color, and decided not to attempt CPR, as he believed it was unnecessary and could worsen his condition. He stayed with Tringali and continued to monitor his condition until the paramedics arrived within a few minutes after they were called. This undisputed evidence, according to L.A. Fitness, shows that it fulfilled its common law duty under Starling to render aid and secure medical assistance for Tringali. Starling merely holds that a business proprietor cannot "ignore" an injured or incapacitated patron and must "take some minimal steps to safeguard" him. Significantly, it does not create a duty to perform medical rescue procedures on him.
In Coccarello, 421 So.2d at 195, the Third District cited Starling and the Restatement (Second) of Torts § 314A in affirming summary judgment in favor of a restaurant that was sued by the wife of a restaurant patron who died after choking on food at the restaurant. The court stated that the restaurant had a duty to "take reasonable action to give or secure first aid" and held that the restaurant fulfilled its duty, as a matter of law, when its employees called a rescue team which arrived within five minutes after being summoned.
As mentioned above, we have found no precedent for imposing the duty appellee proposes here. None of the authorities cited by appellee support imposing a duty upon health clubs or gyms to have CPR-trained employees on site at all times for medical emergencies and to require such employees (who generally lack medical training) to perform CPR on injured patrons when such a procedure may be warranted. At trial, appellee presented expert testimony about health club industry standards and recommendations regarding CPR. Although the custom and practice of an industry can help define a standard of care a party must exercise after it has undertaken a duty, industry standards do not give rise to an independent legal duty. See, e.g., Canal Barge Co., Inc. v. Torco Oil Co., 220 F.3d 370, 377 (5th Cir.2000); Fla. Fuels, Inc. v. Citgo Petroleum Corp., 6 F.3d 330, 334 (5th Cir.1993); Lee v. Pa. R. Co., 192 F.2d 226, 229 (2d Cir.1951); Mallor v. Wolk Props., Inc., 63 Misc.2d 187, 311 N.Y.S.2d 141, 148 (N.Y.Sup.1969).
Courts in other jurisdictions which have examined the issue of a business owner's duty to injured patrons have generally held that a business owner satisfies its legal duty to come to the aid of a patron experiencing a medical emergency by summoning medical assistance within a reasonable time. They have declined to extend the duty of reasonable care to include providing medical care or medical rescue services. See Lundy v. Adamar of N.J., Inc., 34 F.3d 1173 (3d Cir.1994) (affirming summary judgment for casino owner sued by patron who suffered a cardiac arrest and alleged that casino breached its duty to provide medical care because it did not have an intubation kit on the premises or the personnel necessary to perform an intubation); Rotolo v. San Jose Sports and Entertainment, LLC, 151 Cal.App.4th 307, 59 Cal.Rptr.3d 770 (2007) (holding that special relationship between operators of sports facility and hockey players did not create a duty to notify users of the facility of the existence and location of AEDs at the facility); Pacello v. Wyndam Int'l, 41 Conn. L. Rptr. 193, 2006 WL 1102737 (Conn.Super.2006) (stating that a hotel's duty to provide "first aid" to a guest who *559 suffered a heart attack did not encompass skilled treatment, such as applying oxygen and administering CPR); Salte v. YMCA of Metro. Chicago Found., 351 Ill.App.3d 524, 286 Ill.Dec. 622, 814 N.Ed.2d 610, 614-15 (2004) (affirming dismissal of action brought against health club owner by wife of health club member who suffered cardiac arrest while using treadmill and holding that owner did not have a duty to have a cardiac defibrillator on its premises and its staff did not have a duty to use a defibrillator on the health club member); Atcovitz v. Gulph Mills Tennis Club, Inc., 571 Pa. 580, 812 A.2d 1218 (2002) (holding that tennis club owed no duty to tennis club member who suffered heart attack while playing tennis to acquire and maintain a defibrillator on its premises for emergency use); Rutnik v. Colonie Ctr. Court Club, Inc., 249 A.D.2d 873, 672 N.Y.S.2d 451, cert. denied, 92 N.Y.2d 808, 678 N.Y.S.2d 593, 700 N.E.2d 1229 (1998) (holding that racquetball club was not negligent in failing to have a defibrillator present on premises for immediate emergency use).
Even if we construe Starling and Coccarello as adopting the Restatement's obligation to provide "first aid" to business invitees, we nonetheless conclude that such obligation does not encompass the duty to perform skilled treatment, such as CPR. "First aid requires no more assistance than that which can be provided by an untrained person." Pacello, 2006 WL 1102737 at *6 (Conn.Super.2006). The Connecticut court elaborated:
In accordance with this common understanding of the term, the American Red Cross and the American Heart Association's Guidelines for First Aid (Guidelines) provide a clear picture of what "first aid" may include. Common first aid interventions include: calling for help: positioning a victim: administering medications to an acute asthma or anaphylactic reaction sufferer; ensuring that a seizure victim has an open airway; controlling a victim's bleeding by applying pressure; irrigating and applying antibiotic ointment to wounds and abrasions; cooling thermal burns, covering blisters; assessing victims of electrocution; manually stabilizing the head of a blunt trauma victim so the head, neck and spine do not move and are kept in line; applying cold packs to soft-tissue injuries such as sprains and muscle contusions; rinsing an avulsed tooth with water and placing it in milk for transport to the dentist; snugly bandaging an elapid snakebite, immobilizing the bitten extremity and immediately getting medical help; warming a victim of hypothermia; removing a drowning victim from the water; calling the poison control center, safely removing chemicals, and irrigating a chemical burn site with water.
Id.
Cardiopulmonary resuscitation (CPR), which requires training, is more than mere "first aid." Although the procedure for CPR is relatively simple and widely known as a major technique for saving lives, it nonetheless requires training and re-certification. Unlike first responders, for whom performing CPR is routine, non-medical employees certified in CPR remain laymen and should have discretion in deciding when to utilize the procedure.
Courts have similarly found that the Heimlich maneuver is a rescue technique that is not included in a business owner's duty to render aid to patrons facing medical emergencies. See Campbell v. Eitak, Inc., 893 A.2d 749 (Pa.Super.2006) (holding that summary judgment was properly entered for a restaurant where a patron, who choked on chicken in restaurant, filed a negligence suit against the restaurant for failure to have policies and procedures for *560 responding to a choking emergency and for failure to administer appropriate first aid); Baker v. Fenneman & Brown Props., LLC, 793 N.E.2d 1203 (Ind.App.2003) (holding that imposing duty on business to take reasonable action to give aid to a customer who fell on premises of fast food restaurant would not require businesses to hire employees who were trained to diagnose and provide medical services); Lee v. GNLV Corp., 117 Nev. 291, 22 P.3d 209 (Nev.2001) (holding that a restaurant's duty to take "reasonable affirmative steps" to aid patrons in need of medical attention did not specifically require the restaurant to perform the Heimlich maneuver on a choking customer); Drew v. LeJay's Sportsmen's Cafe, 806 P.2d 301, 305 (Wyo. 1991) (expressly rejecting the duty set forth in the Restatement to provide first aid to invitees and holding that a restaurant's duty to a patron who choked on food was discharged by summoning medical assistance within a reasonable time); Breaux v. Gino's Inc., 153 Cal.App.3d 379, 200 Cal.Rptr. 260 (1984) (holding that state statute established as a matter of law that a restaurant meets it legal duty to a patron in distress when it summons medical assistance within a reasonable time).

Negligent Undertaking
Another theory of liability advanced by appellee is that, even if L.A. Fitness's common law duty of care to Tringali did not require it to give CPR to Tringali, L.A. Fitness voluntarily assumed a duty to perform CPR. Appellee argues that once Strayer undertook to assist Tringali and evaluate him for CPR, he had a duty to perform CPR with reasonable care.
Florida law requires that an action undertaken for the benefit of another, even gratuitously, be performed in accordance with an obligation to exercise reasonable care. See Vendola v. S. Bell Tel. & Tel. Co., 474 So.2d 275, 278 (Fla. 4th DCA 1985); Barfield v. Langley, 432 So.2d 748, 749 (Fla. 2d DCA 1983). This principle can be found at Restatement of Torts (Second) § 323, which states:
One who undertakes, gratuitously or for consideration to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.
L.A. Fitness argues that its employees' actions in checking on Tringali did not amount to an undertaking to perform CPR on him. It cites Daley v. U.S., 499 F.Supp. 1005 (D.Mass.1980), in explaining why this "negligent undertaking" doctrine does not apply in this case. In Daley, the victim went missing at sea in a motorboat. The Coast Guard was not required to conduct a search and rescue. However, upon initially learning of the situation, the Coast Guard instituted a PRECOM, which is an inquiry of all harbor masters in the area to determine if the boat might have landed elsewhere. Ultimately, the Coast Guard did a search, but to no avail. The widow of the missing seaman brought an action against the United Stated under the Federal Tort Claims Act asserting that, by delaying the search for an excessive period after the PRECOM, the Coast Guard had acted negligently. The district court stated:
Plaintiff argues that the PRECOM is an "initial step in an SAR (Search and Rescue) mission (and that) (o)nce the Coast Guard undertakes a rescue mission it is under a duty to conduct that mission *561 with reasonable care." This is a misconception as well as an overstatement. The purpose of the PRECOM is to assist in determining whether to do anything further. Absent some promise or affirmative representation, of which there were none here, instituting a PRECOM commits the Coast Guard to nothing. Failure to follow it up is not comparable to abandoning a search that is already underway.
Id. at 1009. The above analysis applies here. L.A. Fitness employee Strayer took the preliminary step of assessing the decedent, including taking his pulse. The question is whether that assessment committed him to performing CPR if that was indicated. Generally speaking, we do not believe that it did. In the Coast Guard case, the district court further stated:
To return to plaintiff's contention that undertaking a search obliges the Coast Guard to conduct it carefully, this is true if the Coast Guard thereby worsens the subject's position, as by causing affirmative injury. . . . Or there may be indirect harm, as by causing other searchers, or possible searchers, to "rest on their oars", Lacey v. United States, D.Mass, 1951, 98 F.Supp. 219, in reliance on the Coast Guard's undertaking and its presumed, unless affirmatively disclaimed, competency.
Id. at 1010; see also Berg v. Chevron U.S.A., 759 F.2d 1425 (9th Cir.1985). Here, appellee did not allege or establish that Strayer worsened Tringali's condition or caused him any affirmative injury. Appellee also failed to assert or establish that Strayer's assessment of Tringali caused others to "rest on their oars" and refrain from rendering aid in reliance on Strayer's undertaking. After carefully considering the record, we can find no support for appellee's assumed duty theory.[2]

Defibrillators
Appellee also asserted that L.A. Fitness's duty of reasonable care required it to have an automatic external defibrillator (AED) on its premises and to use it on the deceased. There is no common law or statutory duty that a business have an AED on its premises. On the contrary, the Florida legislature has adopted the "Cardiac Arrest Survival Act" § 768.1325, Fla. Stat., which does not require that an AED be placed in any building or location or that an acquirer of an AED have persons trained in the use of AEDs available on the premises.
Above, we cited cases from other jurisdictions which uniformly found that health *562 clubs and other business establishments have no common law duty to have an AED on the premises. See Rotolo, 59 Cal. Rptr.3d at 770, Salte, 286 Ill.Dec. 622, 814 N.E.2d at 614-15; Atcovitz; 812 A.2d at 1218; Rutnik, 672 N.Y.S.2d at 451. We find these cases, as well as F.S. § 768.1325, persuasive as we hold that L.A. Fitness did not breach its duty to the deceased by failing to have an AED on its premises.
In sum, we conclude that, under the circumstances presented in this case, L.A. Fitness, through its employees, fulfilled its duty of reasonable care in rendering aid to the deceased by summoning paramedics within a reasonable time. L.A. Fitness did not have a legal duty to have CPR-qualified employees on site at all times, and their employees were under no legal duty to administer CPR to the deceased. Further, L.A. Fitness had no legal duty to have a defibrillator on the premises for emergency use on the deceased. Because we determine as a matter of law that L.A. Fitness took reasonable action to secure first aid for the deceased and did not breach any duty of reasonable care to him, we reverse and remand for entry of judgment for L.A. Fitness.[3]
Reversed and Remanded.
POLEN, J., concurs in part and dissents in part.
STEVENSON, J., concurs specially with opinion.
STEVENSON, J., concurring specially.
I agree with the majority opinion. I write separately only to emphasize that the facts in this case simply do not legally support recovery on the assumption of duty doctrine with regard to Mr. Strayer's failure to perform CPR on Mr. Tringali. The voluntary assumption of duty doctrine, also referred to as the voluntary undertaking doctrine, was discussed in Union Park Memorial Chapel v. Hutt, 670 So.2d 64 (Fla. 1996), a case in which suit was brought against a funeral home director who had voluntarily organized a funeral procession, but did so negligently:
Voluntarily undertaking to do an act that if not accomplished with due care might increase the risk of harm to others or might result in harm to others due to their reliance upon the undertaking confers a duty of reasonable care, because it thereby "creates a foreseeable zone of risk." McCain v. Fla. Power Corp., 593 So.2d 500 (Fla. 1992); . . .
We recognize that a funeral director has no general duty to orchestrate or lead a funeral procession. However, once a director voluntarily undertakes to do so, the director assumes at least a minimal duty to exercise good judgment, and ensure that procession members proceed to the cemetery in a safe manner.
670 So.2d at 67 (citation omitted).
As illustrated by Union Park Memorial Chapel, the doctrine of voluntary assumption of duty requires some voluntary undertaking on the part of the alleged tortfeasor. See also Kowkabany v. Home Depot, Inc., 606 So.2d 716 (Fla. 1st DCA 1992) (defendant's voluntary undertaking to load landscape timbers into vehicle created duty to bicyclist struck by timbers which protruded from vehicle window); Garrison Ret. Home Corp. v. Hancock, 484 So.2d 1257 (Fla. 4th DCA 1985) (retirement home voluntarily supervised resident's activities but did so negligently); *563 Fid. & Cas. Co. of N.Y. v. L.F.E. Corp., 382 So.2d 363 (Fla. 2d DCA 1980) (consulting engineer voluntarily undertook to design lightening protection for revenue control system but did so negligently). In the instant case, Mr. Strayer, an LA Fitness sales representative, decided not to perform CPR and therefore no undertaking was ever assumed. To suggest that Mr. Strayer's decision not to administer CPR could amount to the breach of a duty created by a voluntary undertaking is contrary to the case law and amounts to a type of circular reasoning which this court should rightly reject. In the instant case, no duty could arise based on an undertaking which never took place.
POLEN, J., concurring in part and dissenting in part.
I respectfully dissent. While I agree with the majority that L.A. Fitness had no duty to have an automatic external defibrillator device, I disagree with the reversal on other grounds. I would hold that it was a jury question whether the defendant breached its duty of care to its business invitee, and the extent to which its negligence contributed to his death. This is particularly so as to the plaintiff's negligent undertaking theory. Even if defendant's employee had no duty to attempt to perform CPR on Mr. Tringali, though he apparently had some training in CPR, once Mr. Strayer undertook to assess Tringali's situation to determine if CPR was indicated, a jury could properly find that Strayer was negligent in his actions (or inaction). I would affirm the jury's verdict and judgment entered.
NOTES
[1] Hovermale v. Berkeley Springs Moose Lodge No. 1483, 165 W.Va. 689, 271 S.E.2d 335 (1980).
[2] Given the current state of Florida's Good Samaritan Act, F.S. 768.13, we have some public policy concerns regarding the potential impact of our ruling in this case. The Good Samaritan statute, which purports to insulate from liability those who assist injured parties in an emergency, in truth, provides very little protection. See Botte v. Pomeroy, 438 So.2d 544, 545 (Fla. 4th DCA 1983). The immunity given under the Act to a person who gratuitously renders aid to an injured person is conditioned upon that person rendering aid "as an ordinary reasonably prudent person." Because this is no different than the common law standard of care that applies without this so-called immunity, the protection under the act is illusory.

Thus, a business owner who has no legal duty to provide CPR to an injured invitee in a medical emergency might consider himself better off not undertaking to administer CPR. This is because he risks liability only if he voluntarily undertakes to administer CPR and then performs the procedure negligently. As our court did many years ago in Botte, we place the blame for this quandary on the legislature's failure to update the Good Samaritan Act. As written, the Act does not adequately protect individuals from civil liability for negligent acts committed while voluntarily providing emergency care. It thus discourages individuals from performing specialized skills, such as CPR, on injured persons when they have no duty to do so.
[3] In light of our ruling, we need not address other issues raised in this appeal and cross-appeal.