MORRIS, Judge.
 

 Gerald M. White and Melanie White, husband and wife, appeal a final summary judgment entered in favor of Advanced Neuromodulation Systems, Inc. (ANS), Wendy Bolin, R.N., and Pain Management Systems, Inc. (PMS). In 2005, Mr. White became paralyzed after an infection developed around a surgical device which had been implanted into his back to treat chronic back pain. In the Whites’ complaint, they asserted that Bolin, acting as an agent of ANS and PMS, negligently rendered nursing care while reprogramming the device. The trial court granted summary judgment on the basis that Bolin did not have a duty to treat Mr. White’s infection but even if she did, that she adequately discharged that duty. For the reasons set forth herein, we affirm.
 

 I. Background
 

 ANS is the manufacturer and distributor of the spinal cord stimulator implanted into Mr. White’s back. PMS is an independent company which contracted with ANS to provide sales and servicing of the stimulators. Because the stimulators are used to treat chronic back pain, they have a variety of programs and modes which can be modified according to a patient’s pain level. The modification of the programming and modes must be performed by a technician who either is employed by or contracts with ANS. Notably, a person is not required to have medical training in order to be a programming technician. In fact, although a majority of the programming technicians have nursing backgrounds, there are some who do not. Programming technicians have no access to patients’ medical records or histories and have no authority to provide any type of medical diagnosis or treatment. ANS guidelines require that if a patient asks questions related to his medical care, the programming technician is required to direct the patient to make an appointment with them treating doctor.
 

 ANS hired Bolin as a programming technician in June 2005. Prior to that time, Bolin worked for PMS, which provided programming services for ANS as an independent contractor. Although Bolin is a registered nurse, her position as a programming technician with ANS did not involve the provision of nursing care.
 

 
 *633
 
 In early 2004, Mr. White consulted with a neurosurgeon, Dr. Moyer, about his chronic back pain, and Dr. Moyer recommended the spinal stimulator. It is undisputed that Dr. Moyer explained to Mr. White that the surgical procedure to implant the device carried a risk of infection. Despite the warning, Mr. White proceeded with the implantation of a trial stimulator in April 2004 and, ultimately, with the implantation of the permanent stimulator.
 

 Bolin first met Mr. White on the day his trial stimulator was implanted. She explained that she was an ANS employee and that it was her job to program the stimulator. Mr. White knew Bolin had a nursing background, but it is undisputed that he knew she would not be providing any nursing care. The day after the trial stimulator was implanted, Mr. White complained to Bolin regarding seepage from the surgical site. Bolin instructed Mr. White to contact Dr. Moyer. Mr. White did so, and Dr. Moyer’s physician’s assistant told him that seepage was not unusual given the circumstances.
 

 Mr. White had no contact with Bolin between June 2004 and the beginning of January '2005. On January 10, 2005, Mr. White contacted Bolin to tell her that the permanent stimulator had not been working and that he had an oozing cyst near the surgical site. Bolin met Mr. White at Dr. Moyer’s office within an hour of the phone call. Bohn programmed the stimulator and saw what appeared to be “purulent discharge” from the surgical site. Bolin instructed Mr. White to make an appointment to see Dr. Moyer immediately. Mr. White explained that Dr. Moyer would not see him because of an unpaid bill
 
 [1]
 
 and that he would go to see his primary care physician instead. Bolin emphasized to Mr. White that he needed to see Dr. Moyer. In an effort to assist Mr. White in obtaining an appointment, Bolin discussed Mr. White’s condition with Dr. Moyer’s scheduling secretary and left the programming notes for Dr. Moyer to review. Her notes indicated the “purulent discharge” at the surgical site and that Mr. White needed an appointment.
 

 Mr. White was still unable to obtain an appointment with Dr. Moyer so Mr. White went to see his primary care physician, Dr. Waks, three days after the meeting with Bolin. Dr. Waks examined the surgical site, noted yellow drainage, and told Mr. White that it was essential that he [Mr. White] see Dr. Moyer. Dr. Waks also prescribed some antibiotics.
 

 Bolin followed up with Mr. White on January 17, 2005, to inquire whether he had seen Dr. Moyer. Mr. White then told her he had not seen Dr. Moyer but that he had seen Dr. Waks and had received a prescription for antibiotics. Bolin again urged Mr. White to see Dr. Moyer since he was the physician who implanted the stimulator.
 

 Two weeks later, Mr. White saw Dr. Waks again, and at that time, Mr. White told Dr. Waks that Dr. Moyer was still refusing to see him. Dr. Waks noted multiple cysts had formed on Mr. White’s back which was typical for Mr. White. Dr. Waks surmised that the earlier drainage was likely from one of these cysts; Dr. Waks also concluded that none of the cysts appeared to be infected. Dr. Waks did not see Mr. White again until April 2005 at which time Dr. Waks told Mr. White that the surgical site was infected and that Mr. White should see Dr. Moyer to have the stimulator removed.
 

 
 *634
 
 Mr. White contacted Bolin on May 24, 2005 — over four months since their last conversation on January 17, 2005. Bolin asked Mr. White about the surgical site, and Mr. White reported that it was still oozing sometimes but that it was “okay.” As before, Bolin instructed Mr. White to see Dr. Moyer for an evaluation.
 

 Mr. White scheduled his next programming session for June 1, 2005. Bolin was not available for that appointment so another ANS programming technician, Dawn Dunham, met Mr. White at Dr. Moyer’s office. At that appointment, Dunham prevailed on Dr. Moyer’s physician’s assistant to examine Mr. White’s surgical site. The physician’s assistant concluded the drainage was from one of Mr. White’s chronic cysts and told Mr. White that it was “nothing to worry about.” However, the physician’s assistant scheduled an appointment for Mr. White to see Dr. Moyer about two weeks later. Dunham reported all of this information to Bolin. Ultimately, the appointment with Dr. Moyer was cancelled due to Mr. White’s unpaid bill.
 

 Bolin learned about the cancelled appointment and went to Dr. Moyer’s office on June 9, 2005. After being told by the receptionist that the bill would have to be paid before Dr. Moyer would see Mr. White, Bolin spoke directly with Dr. Moyer, informing him that Mr. White had been refused appointments because of the unpaid bill. Dr. Moyer assured Bolin that he would never refuse to see anyone. As a result of that conversation, Bolin believed a new appointment would be scheduled.
 

 A few weeks later, Mr. White started seeing a new pain management physician. Bolin accompanied Mr. White to his appointment so that she could program the stimulator. The pain management physician recommended that Mr. White return to Dr. Moyer to have the stimulator removed. However, Mr. White did not go to see Dr. Moyer. Instead, he returned to Dr. Waks and to the pain management physician complaining of numbness in his legs. After being referred to another neurosurgeon, Mr. White was diagnosed with diabetic neuropathy. Bolin was informed of this diagnosis on August 12, 2005. Unfortunately, that diagnosis was incorrect, and two days after Bolin learned of the diagnosis, Mr. White became partially paralyzed as a result of the infection at the surgical site which caused compression on his thoracic spinal cord. Dr. Moyer removed the stimulator immediately thereafter. Dr. Moyer stated that he would have removed the stimulator earlier if he had been made aware of the specific nature of Mr. White’s symptoms and complaints.
 

 The Whites ultimately filed their complaint predicated on medical malpractice as against the various physicians involved in Mr. White’s care and against Bolin on the theory that her nursing license subjected her to liability for medical malpractice. The Whites sued ANS and PMS based on a theory of vicarious liability. The Whites settled or voluntarily dismissed them claims against all of the physicians. This appeal is the result of the trial court’s order granting final summary judgment for Bolin, ANS, and PMS.
 

 II. Analysis
 

 A. Our standard of review
 

 This court conducts a de novo review of an order granting summary judgment based on a pure question of law.
 
 See Clay Elec. Coop., Inc. v. Johnson,
 
 873 So.2d 1182, 1185 (Fla.2003);
 
 Estate of Johnson v. Badger Acquisition of Tampa, LLC,
 
 983 So.2d 1175, 1180 (Fla. 2d DCA 2008). “While breach, causation, and damages are typically questions for the finder of fact, the determination of duty is a
 
 *635
 
 matter of law.”
 
 Estate of Johnson,
 
 983 So.2d at 1180.
 

 B. The undertaker’s doctrine
 

 The Whites assert that Bolin, ANS, and PMS are all liable based on the undertaker’s doctrine. The undertaker’s doctrine provides that “[w]henever one undertakes to provide a service to others, whether one does so gratuitously or by contract, the individual who undertakes to provide the service — i.e., the ‘undertaker’ — thereby assumes a duty to act carefully and to not put others at an undue risk of harm.”
 
 Clay Elec. Coop., Inc.,
 
 873 So.2d at 1186. The doctrine comes into play where a plaintiff alleges a defendant voluntarily undertook an action which, although statutorily authorized, is not required.
 
 See Padgett v. Sch. Bd. of Escambia Cnty.,
 
 395 So.2d 584, 585 (Fla. 1st DCA 1981).
 

 The Whites contend that Bolin gratuitously undertook a duty to provide Mr. White with nursing care when she voluntarily exceeded her role as a programming technician and actually practiced professional nursing as defined by the Florida Nurse Practice Act set forth in chapter 464, Florida Statutes (2003-2005). The Whites argue that because the Nurse Practice Act defines the practice of professional nursing as including “observation[s]” and “assessment[s]” that require “specialized knowledge, judgment, and nursing skill,”
 
 see
 
 § 464.003(3)(a)(1), Bo-lin’s conduct in observing and assessing Mr. White’s condition on January 10, 2005 — when she observed the “purulent discharge” — constitutes the practice of professional nursing. The Whites also allege that Bolin’s observations of Mr. White on January 17, 2005, constitute the practice of professional nursing.
 

 Notably, the Whites do not argue that Bolin acted negligently in observing and assessing Mr. White on these dates; rather, they base their malpractice claim on the idea that Bolin’s actions obligated her to do more. The Whites contend that Bolin was obligated to personally confront Dr. Moyer about Mr. White’s symptoms and to ensure that Dr. Moyer treated Mr. White and that Bolin was obligated to inform ANS’s medical director of Mr. White’s symptoms. They also contend that Bolin should have warned Mr. White that an infection at the incision site could result in paralysis.
 

 In
 
 Estate of Johnson,
 
 this court rejected the very arguments that the Whites advance here. There, the estate sued a pharmacist who provided consulting services to the nursing home where Ms. Johnson resided. 983 So.2d at 1178-79. The estate alleged that the pharmacist should have been persistent in recommending the modification of Ms. Johnson’s treatment plan to Ms. Johnson’s treating physician.
 
 Id.
 
 at 1183. The estate asserted that if the pharmacist had done so, Ms. Johnson would not have died as a result of an adverse drug reaction.
 
 Id.
 
 at 1179. The trial court granted summary judgment for the pharmacist, and on appeal, we affirmed. In doing so, we held that “[ajlle-gations of a negligent omission to act do not create a duty for a party where the risk was put in place by another.”
 
 Id.
 
 at 1183-84.
 

 Just as the pharmacist in
 
 Estate of Johnson
 
 did not create the risk posed to Ms. Johnson by the flawed drug regimen, here Bolin did not create the risk posed to Mr. White by the implantation of the stimulator. And just as the pharmacist in
 
 Estate of Johnson
 
 had no duty to convince a physician to modify Ms. Johnson’s drug regimen, Bolin had no duty to ensure that Dr. Moyer provided proper care to Mr. White — although the record evidence reflects that Bolin certainly tried to do so.
 

 
 *636
 
 Another case dealing with the undertaker’s doctrine is
 
 L.A. Fitness International, LLC v. Mayer,
 
 980 So.2d 550 (Fla. 4th DCA 2008). There, a health club employee who was certified in CPR voluntarily undertook to assist a customer by checking his pulse and assessing the need for CPR; ultimately the employee decided not to perform CPR based on his belief that the customer was having a seizure or stroke.
 
 Id.
 
 at 552. At trial, expert witnesses opined that the employee should have performed CPR and that it would have likely saved the customer’s life.
 
 Id.
 
 at 554. The customer’s estate won a judgment against the health club on the theory that once the employee began to assess the customer’s need for CPR, the employee also assumed the duty to perform CPR with reasonable care.
 
 Id.
 
 at 552.
 

 On appeal, the court reversed and held the health club was entitled to judgment as a matter of law.
 
 Id.
 
 at 562. The court recognized that a person who performs a voluntary act has no duty to do more than the duty undertaken.
 
 Id.
 
 at 561. The court held that the employee’s actions in assessing the customer for CPR did not commit him to perform CPR even if it was indicated, reasoning that the employee’s actions neither “worsened [the customer’s] condition” nor caused others to “refrain from rendering aid in reliance on [the employee’s] undertaking.”
 
 Id.
 

 In contrast to
 
 Estate of Johnson
 
 and
 
 L.A. Fitness International, LLC,
 
 the Florida Supreme Court in
 
 Wallace v. Dean,
 
 3 So.3d 1035 (Fla.2009), held that the plaintiff stated a claim for negligence based on the undertaker’s doctrine. There, sheriffs deputies voluntarily performed a safety check on a woman after neighbors were unable to contact her.
 
 Wallace,
 
 3 So.3d at 1041. The deputies found the woman lying on a bed, unresponsive.
 
 Id.
 
 at 1043. The neighbors told the deputies that the woman might be in a diabetic coma, and they asked the deputies to call for an ambulance.
 
 Id.
 
 The deputies rejected that request and assured the neighbors that the woman was “merely sleeping.”
 
 Id.
 
 Based on those assurances, the neighbors did nothing more until the next day when, upon finding the woman still unresponsive, they called for an ambulance.
 
 Id.
 
 The woman ultimately died.
 
 Id.
 

 The court held that the undertaker’s doctrine applied there because the deputies’ voluntary actions increased the risk of harm to the woman by assuring the woman’s neighbors that the woman did not need medical attention and by rejecting the neighbor’s requests for a call for an ambulance.
 
 Id.
 
 at 1052.
 

 The facts in
 
 Wallace
 
 are distinguishable from the facts here. Bolin’s actions in observing and assessing Mr. White’s incision site did nothing to increase the risk of harm to Mr. White. Nor did Bolin’s actions cause other people to refrain from rendering aid. In fact, the record reflects that Bolin sought out aid for Mr. White, even speaking personally to Dr. Moyer in an effort to schedule an appointment for Mr. White.
 

 We therefore hold that similar to the pharmacist in
 
 Estate of Johnson
 
 and the health club employee in
 
 L.A. Fitness International, LLC,
 
 Bolin’s voluntary actions did not impose an affirmative duty on her to do any more than she had already done.
 

 Affirmed.
 

 VILLANTI and CRENSHAW, JJ., Concur.
 

 [1]
 

 . Mr. White lost his job and health insurance the day after Dr. Moyer implanted the permanent stimulator. Because of his lack of insur-anee, Mr. White accrued an unpaid balance with Dr. Moyer.