# Third District Court of Appeal

**State of Florida**

Opinion filed December 27, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-1218
Lower Tribunal No. 10-38782
_____

**Crystal Sewell,**
Appellant,

vs.

**Racetrac Petroleum, Inc.,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Thomas J. Rebull, Judge.

Schlesinger Law Offices, P.A., and Gregg A. Schlesinger and Zane Berg (Fort Lauderdale); Brannock & Humphries, and Shea T. Moxon and Celene Humphries (Tampa), for appellant.

Luks, Santaniello, Petrillo & Jones, and Daniel J. Santaniello, Edgardo Ferreyra, Jr., Shana P. Nogues, and Heather M. Calhoon, for appellee.

Before ROTHENBERG, C.J., and EMAS and LOGUE, JJ.

LOGUE, J.

Crystal Sewell lost control of her vehicle and hit a palm tree after her car was allegedly cut off by an unknown vehicle that took a left-hand turn from a gas station and abruptly joined the lane of traffic in which Sewell was traveling. In doing so, the unknown vehicle traveled through a cut in the concrete median provided for traffic. Sewell sued Racetrac Petroleum, Inc., the corporation that owned, developed, and operated the gas station, in large part because Racetrac created a dangerous condition when it lobbied the local county government to create the cut in the median to promote access to its property.

Sewell appeals the dismissal of her negligence action against Racetrac, the denial of her motion to plead punitive damages, and the denial of her motion for spoliation damages. We affirm without discussion the denial of the motion to plead punitive damages and the denial of her motion for spoliation damages. Regarding the dismissal of her case, we affirm in part and reverse in part.

## I.    Background

According to the complaint, on August 29, 2007, Sewell was driving eastbound on Northeast 8th Street in Homestead, Florida. Northeast 8th Street is a four-lane road with two eastbound lanes of traffic and two westbound lanes divided by a concrete median. Racetrac's gas station is located on the northern side of Northeast 8th Street. Opposite the gas station, there is a cut in the concrete median. The cut allows vehicles traveling east on Northeast 8th Street to enter a

2

turn lane at the cut and use the cut to turn left into the gas station. It also allows vehicles exiting the gas station to turn left out of the gas station and go eastbound on Northeast 8th Street.

Sewell alleges that as she approached the gas station, an unknown vehicle exited the gas station, traversed the cut, turned left, and joined the eastbound lane of travel in which Sewell was also traveling. As a result, Sewell lost control of her vehicle, hit a palm tree, and suffered injuries. Sewell did not allege that either car's view was obscured or obstructed.

Sewell's complaint presents two legal theories. The main legal theory is that Racetrac's application to obtain the cut in the concrete median to facilitate traffic into and out of the property was tortious because Racetrac "knew or should have known that opening the median to allow 'full access' would . . . pose an undue risk of harm to the motoring public" and "[i]f the median had not been removed to permit vehicles exiting the subject gas station to turn left, the subject collision would not have occurred."

In 1977, Racetrac agreed to purchase the property only if the governing agencies approved the cut in the median. In obtaining approval from Miami-Dade County, Racetrac submitted one traffic study that used the Institute of Transportation Engineers Trip Generation category for "Convenience Market with Gas Pumps." Sewell alleges that "there were other categories . . . that would have

3

been more applicable to Racetrac." Racetrac also submitted another traffic study that should have been based on a different set of its existing stores. Sewell further alleges that Racetrac, through "bribery and corruption," obtained the support of its application from City of Homestead officials, although, as the complaint admits, "city officials don't get to decide whether the median gets removed or not (county officials do)."

The complaint presents a second theory of liability that Racetrac negligently failed to make adjustments on its own property to deal with the alleged danger presented to the traveling public by vehicles turning left out of its property. In particular, Sewell alleged that Racetrac painted driveway markings that encouraged customers to turn left out of its property when it knew or should have known that such turns presented an unreasonable danger.

Racetrac filed a motion to dismiss, which the trial court granted after briefing and an extensive argument. This appeal followed.

## II.    Analysis

In reviewing a motion to dismiss, the truth of the allegations is assumed. See Xavier v. Leviev Boymelgreen Marquis Developers, LLC, 117 So. 3d 773, 775 (Fla. 3d DCA 2012) ("In ruling on a motion to dismiss, all well-pled facts in the complaint are accepted as true.").

4

The trial court dismissed the complaint because it found that Racetrac owed no legal duty to Sewell. At the outset, we note that while the tort of negligence requires the establishment of duty, breach, proximate cause, and damages, it is for the court to determine the existence of a duty. "Duty is the standard of conduct given to the jury for gauging the defendant's factual conduct." McCain v. Florida Power Corp., 593 So. 2d 500, 503 (Fla. 1992). It "exists as a matter of law and is not a factual question for the jury to decide." Id.

The touchstone for determining whether a duty exists is "foreseeability." Id. "[W]here a person's conduct is such that it creates a 'foreseeable zone of risk' posing a general threat of harm to others, a legal duty will ordinarily be recognized to ensure that the underlying threatening conduct is carried out reasonably." Williams v. Davis, 974 So. 2d 1052, 1056 (Fla. 2007). In a few "exceptional" areas of the law, however, a legal duty is sometimes not recognized or is substantially curtailed even if the risk is foreseeable. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 (Am. Law Inst. 2010).[1]

Regarding landowner liability, for example, the Florida Supreme Court has held that an owner of residential property in a rural area did not have a duty to cut trees contained entirely in its property to ensure vehicles approaching an

---

[1] Examples include, but are not limited to, the infliction of emotional distress, Metro. Life Ins. Co. v. McCarson, 467 So. 2d 277, 278 (Fla. 1985); sovereign immunity, Commercial Carrier Corp. v. Indian River Cty., 371 So. 2d 1010, 1013 (Fla. 1979); and parental immunity, Ard v. Ard, 414 So. 2d 1066, 1066 (Fla. 1982).

5

intersection from different directions could see each other, even though it was foreseeable that the blocked view might cause vehicles driven by negligent drivers to collide. Williams, 974 So. 2d at 1058-59. In that case the Court held that McCain's foreseeability analysis did not create landowner liability in that context:

> [W]hile we have found there is no principled basis for not extending the law of negligence set out in McCain to the conditions on private property that may protrude into the public right-of-way so as to create a hazard to adjacent traffic, we conclude that residential landowners who do not permit conditions on their land to extend beyond its boundaries should not be subject to the same liability.

Williams, 974 So. 2d at 1063.

Thus, as the law of Florida has held for almost fifty years, "'[d]uty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection [or not]." Gracey v. Eaker, 837 So. 2d 348, 354-55 (Fla. 2002) (quoting Rupp v. Bryant, 417 So. 2d 658, 667 (Fla. 1982)).

As Gracey teaches, the determination of whether a particular duty of care exists may depend on the nature of the relationship between the parties. Cf. Limones v. Sch. Dist. of Lee Cty., 161 So. 3d 384, 389 (Fla. 2015) (holding that because of the nature of a school's relationship to their juvenile students, a jury could find that the school breached its duty of care by not providing student athletes with defibrillators); Sells v. CSX Transp., Inc., 170 So. 3d 27, 33 (Fla. 1st

6

DCA 2015) (finding that given the nature of the employer and employee relationship, the employer had no duty to provide defibrillators to employees working in remote locations); L.A. Fitness Int'l, LLC v. Mayer, 980 So. 2d 550, 552 (Fla. 4th DCA 2008) (holding that because of the nature of the relationship between a commercial business and its client, the fitness club had no duty to provide defibrillators).

Turning to this case, the decision of whether or not to improve roadways or upgrade traffic control devices often pits the interests of some users of the roads against the interest of others. For example, businesses and commuters may want traffic control devices that speed up and facilitate the flow of traffic. Neighborhood groups, on the other hand, may want traffic control devices that slow or divert traffic. The process for making these decisions involves the quasi-political balancing of the competing and conflicting needs of different parts of the community with the limited resources available. For this reason, the law recognizes that these matters involve the "judgmental, planning-level decisions" by the political branches of government "which are not actionable." Dep't of Transp. v. Konney, 587 So. 2d 1292, 1295 (Fla. 1991) (citing Trianon Park Condo. Ass'n v. City of Hialeah, 468 So. 2d 912 (Fla. 1985) and Commercial Carrier Corp. v. Indian River Cnty., 371 So. 2d 1010 (Fla. 1979)).

7

By petitioning Miami-Dade County to obtain the cut in the median, Racetrac entered into this planning process. As a participant in this process, Racetrac could advocate freely – even fiercely – for its own interests. Racetrac did not have a relationship with Sewell (or others like her) that would create in Racetrac a legal duty to tailor its petition to protect Sewell and other competing road users.

At best, Sewell alleged Racetrac submitted expert traffic studies that were extremely one-sided and unprofessionally skewed to support its application to have the median cut. Such allegations, without more, are not actionable. This is not a case in which Sewell alleges Racetrac petitioned the government for the primary purpose of intentionally or maliciously harming Sewell or others like her. See, e.g., Londono v. Turkey Creek, Inc., 609 So. 2d 14, 18 (Fla. 1992). For this reason, Racetrac's application to have the median cut, whether riddled with misrepresentations or not, constituted "the statements of a citizen to a political authority regarding matters of public concern" shielded by a "qualified privilege" that has "existed in the law of Florida for many generations and [has] served to provide broad protection for freedom of speech." Nodar v. Galbreath, 462 So. 2d 803, 810 (Fla. 1984) (holding a father's statements to a school board criticizing his son's teacher was not malicious as a matter of law).

At some point, Sewell's main theory may well run afoul of the body of law that grants immunity under the First Amendment to those petitioning government,

8

whether or not their motives are self-seeking or even unethical. See <u>IGEN Int'l, Inc. v. Roche Diagnostics GmbH</u>, 335 F.3d 303, 310 (4th Cir. 2003) ("The Noerr-Pennington doctrine grants First Amendment immunity to those who engage in petitioning activity."); <u>United Mine Workers of Am. v. Pennington</u>, 381 U.S. 657, 670 (1965); <u>Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127 (1961).

As a practical matter, to recognize Sewell's main legal theory would mean, for example, that homeowners could be sued for false statements "negligently" made as part of a petition for specific traffic control or traffic calming devices like speed bumps or traffic circles which make roadways safer for some users but potentially more dangerous for others. When the risks of unintended consequences are fully weighed, this case presents an instance where, in the words of Judge, and later Justice, Alan Lawson, it would be "unwise for the judiciary to expand causes of action to reach conduct clearly beyond the scope historically recognized by law." <u>Walters v. Blankenship</u>, 931 So. 2d 137, 145 (Fla. 5th DCA 2006) (Lawson, J. dissenting).

The cases cited by Sewell do not support her main legal theory that Racetrac's petition to open the concrete median in the roadway outside of its property rises to the level of a tort. In <u>Whitt v. Silverman</u>, 788 So. 2d 210, 212 (Fla. 2001), the Florida Supreme Court held that the owners of a gas station could

9

be liable to pedestrians struck by vehicles exiting the gas station whose views were unsafely and unreasonably blocked by landscaping on the property. And in Thunderbird Drive-In Theatre, Inc. v. Reed, 571 So. 2d 1341 (Fla. 4th DCA 1990), the Fourth District held that a drive-in theater could be held liable for failing to hire off-duty police to manage traffic buildup on the public road used to access its property caused by starting multiple films at the same time. In Thunderbird, the theater was on notice of the dangerous condition created on its property because it had previously hired police for that purpose.

None of the cases cited by Sewell found a property owner liable for making an application to a government entity to effectuate a change in the roadway outside of his or her property. Instead, each of those cases dealt with a property owner whose conduct on its own property created dangers to persons on the adjacent rights of way.

In short, for the reasons stated above, we hold that a person who petitions the government for a road improvement outside of his or her property has no legal duty to guard against the government making a decision that will create an allegedly unreasonably dangerous road condition. Therefore, we find no legal error in the trial court's decision to dismiss that portion of the complaint.

Sewell's second theory of liability concerns Racetrac's duty to manage signs and pavement markings on its own property to protect its customers and the public

10

from the danger of cars exiting the property by turning left and using the existing cut in the median to go eastbound on Northeast 8th Street. The complaint alleges that Racetrac knew or should have known that its conduct in this regard presented an unreasonable danger. This theory is viable under the existing case law recognized in Whitt, Thunderbird, and Napoli v. Buchbinder, 685 So. 2d 46, 47 (Fla. 4th DCA 1996) (holding that an owner can be liable if negligent design of its parking lot and placement of a stop sign caused accident with passing motorist). An owner can be liable for actions it takes or fails to take on its own property that cause vehicles to exit in a manner that the owner knew or should have known creates an unreasonable danger to vehicles on the adjacent roadway. In this regard, the court erred in dismissing that part of the complaint.

Affirmed in part, reversed in part, and remanded.

11

ROTHENBERG, C.J. (concurring in part, dissenting in part).

Crystal Sewell ("Sewell") appeals: (1) the dismissal of her negligence action against Racetrac Petroleum, Inc. ("Racetrac"), a gas station located on Northeast 8th Street in Homestead, Florida; (2) the denial of her motion to plead punitive damages; and (3) the denial of her motion for spoliation damages. I join the portion of the majority opinion affirming the denial of Sewell's motion to plead punitive damages, and motion for spoliation damages. I also join the majority's affirmance of the dismissal with prejudice of the portions of Sewell's negligence claim that are premised on Racetrac's application to the City of Homestead and/or Miami-Dade County ("the County") regarding the installation of an opening in the concrete median on Northeast 8th Street opposite the gas station. I do so because the majority correctly determined that the decision whether to grant the request for the median opening was made by the County, which owns, maintains, and is responsible for all traffic control devices on public roadways within the County,

12

and because Racetrac owed Sewell no legal duty to protect her or the general public against such road improvements, traffic devices, and road conditions approved and maintained by the County. I, however, part ways with the majority regarding its conclusion that Racetrac may be held liable for actions it failed to take to warn public roadway users of the allegedly dangerous condition created by the median opening, or Racetrac's failure to take other corrective measures to lessen the dangers created by the use of the median opening.

Because I agree with the majority opinion in all respects except for its reversal of the trial court's order dismissing Sewell's negligence claim related to Racetrac's failure to warn or to take corrective measures to lessen the dangers allegedly created by the use of the median opening, I will confine my dissent to this one area of disagreement.

### BACKGROUND

Prior to purchasing the property in question, Racetrac sought and obtained approval from the County for the modification of the concrete median separating the eastbound and westbound lanes of vehicular travel on Northeast 8th Street in front of the property Racetrac was interested in purchasing. The modification provided for an opening in the concrete median that would allow vehicles traveling east on Northeast 8th Street to turn left into the gas station and vehicles exiting the gas station to turn left by passing through the opening and traveling east on

Northeast 8th Street.

Sewell, who was traveling in an eastbound lane on Northeast 8th Street, alleges that a "phantom vehicle" rapidly exited the gas station, crossed the two westbound lanes on Northeast 8th Street and, without stopping, passed through the opening in the median and entered into her lane. Sewell, took evasive action, lost control of her vehicle, and crashed into a palm tree. Although Sewell initially stated that she had been travelling at 70 miles per hour ("mph") in a 40 mph speed zone because she was late for work, she subsequently changed her testimony and now claims that she cannot remember if she was late for work or how fast she was driving.

## ANALYSIS

This dissent addresses the issue of whether Racetrac, a commercial property owner, owed Sewell and the public at large (as opposed to an invitee) a legal duty to warn and/or to take corrective measures to lessen the dangers allegedly associated with the use of the opening created in the County-owned and County-maintained median dividing the eastbound and westbound lanes of Northeast 8th Street in front of Racetrac's property. In other words, does Racetrac, the owner of private property adjacent to a County roadway, owe a legal duty to protect motorists traveling on the roadway in front of its establishment? The majority contends that it does. But as will be discussed below, no such duty existed at

14

common law, the Florida Supreme Court has not extended premises liability to non-invitees under the circumstances presented here, and this Court should not be in the business of creating exceptions to pre-existing law.

## A. Premises Liability Law in General

The duties owed by a landowner to those who come onto his property differ from the duties owed to those who do not come on to his property. See Williams v. Davis, 974 So. 2d 1052, 1056 (Fla. 2007):

> Florida tort law has long recognized an entirely distinct set of rules as to the duties owed by a landowner to those who come upon the property, and the law has recognized limited, if any, duties owed by a landowner to those who do not come upon the property.

> As to the duty owed to invitees, the law is clear:

> [A] property owner or occupier owes two duties to an invitee: (1) the duty to use reasonable care in maintaining the property in a reasonably safe condition, and; (2) the duty to warn of latent or concealed dangers which are or should be known to the owner and which are unknown to the invitee and cannot be discovered through the exercise of due care.

Grimes v. Family Dollar Stores of Fla., Inc., 194 So. 3d 424, 427 (Fla. 3d DCA 2016); Denson v. SM-Planters Walk Apartments, 183 So. 3d 1048, 1050 (Fla. 1st DCA 2015); Tallent v. Pilot Travel Ctrs., LLC, 137 So. 3d 616, 617 (Fla. 2d DCA 2014). As will be discussed below, over time, the Florida Supreme Court has extended the duty owed by a landowner to his invitees to property off of the landowner's premises where the landowner (or the possessor) has exercised some

15

measure of control over the property he does not own or when he has impliedly encouraged his invitees to use the property of others in a particular way.

Landowners and possessors may also be held legally liable for injuries sustained by non-invitees off of the premises under very limited circumstances. A landowner or possessor may be subject to liability if he has permitted **conditions on his land** to extend outside the land which he knew or should have known created an unreasonable risk of harm to others not on his land.

Neither of these circumstances or exceptions to general premises liability law are present here. First, Sewell was not an invitee. She was not on Racetrac's property or on her way to or from Racetrac's property when she was injured. Thus, the cases involving invitees injured on or near a landowner's property do not apply to the instant case. Second, the allegedly dangerous condition was the opening to the concrete median located on the County's roadway, not on Racetrac's property. Thus, the cases addressing liability for dangerous conditions on a landowner's property that extend outside the property also do not apply to the instant case. Because neither the Legislature nor the Florida Supreme Court has imposed a legal duty upon a landowner where the injured party was not an invitee or where the dangerous condition did not **originate on the premises** and extend past the premises, nor should we.

B. <u>The law regarding a landowner's duty to invitees</u>

16

As previously stated, a landowner owes a duty to invitees who come onto his property to maintain the premises in a reasonably safe condition. Additionally, a landowner has a duty to warn invitees of latent and concealed perils which are or should have been known to the owner, and which were not known and could not have been known by an invitee who exercises due care. See Hickory House v. Brown, 77 So. 2d 249, 252 (Fla. 1955).

The Fourth District Court of Appeal was not the first Florida court to extend the duties owed to invitees on the premises to invitees off of the premises. See Chateloin v. Flanigan's Enters. Inc., 423 So. 2d 1002 (Fla. 3d DCA 1982) (addressing whether to extend liability to a tavern owner to a situation where a patron shot another patron after leaving the tavern, but declining to do so in that case after finding that the shooting which occurred several miles from the tavern and a considerable time after the patrons had left the tavern, was too remote as to both time and place). The Fourth District did, however, apply liability for off-premises injuries to invitees in Holiday Inns, Inc. v. Shelburne, 576 So. 2d 322 (Fla. 4th DCA 1991), disapproved of on other grounds by Angrand v. Key, 576 So. 2d 322 (Fla. 1995). In Shelburne, several patrons who had been drinking at the bar, left the bar, and as they were heading towards their respective vehicles, a fight broke out in an adjacent lot, three of the patrons were shot, and one patron died from his wounds. Shelburne, 576 So. 2d at 324. Importantly, the Fourth District

17

noted that the shooting occurred only a few feet from the bar and only a few minutes after the patrons had exited the bar, id. at 328; one of the injured patrons had been directed by a bar employee to park on the adjacent lot where the shooting occurred, id. at 324; and fights had occurred with some regularity at or near the bar, id. at 328.

In determining whether the owner of the bar owed a duty of care to his invitees while the invitees were on the adjacent lot, the Shelburne court considered: the extent of control over the off-premises area exercised by the owner of the bar, the fact that the bar's employee had directed the bar's invitees to park in the adjacent lot, the economic benefit derived from the off-premises adjacent property, and the foreseeability that an invitee could be injured while in the adjacent lot.

Since Shelburne, however, the standard for analyzing the duty owed by landowners to their invitees has synthesized into a more workable standard: the foreseeable zone of risk standard. For example, in Johnson v. Howard Mark Productions, Inc., 608 So. 2d 937, 938 (Fla. 2d DCA 1992), the Second District Court of Appeal applied the foreseeable zone of risk standard when it reversed the trial court's order, which had granted summary judgment in favor of Howard Mark Productions, Inc. ("HM Productions") and found, as a matter of law, that HM Productions did not owe a duty of care to protect its invitees on property adjacent to its property. The amended complaint alleged the following. HM Productions

operated a teenage nightclub. Johnson, an invitee, was struck and killed by a motorist while attempting to cross U.S. Highway 41 to patronize HM Productions' teenage nightclub. The teenage nightclub's parking was "woefully insufficient" and, as a result, teenagers (invitees), including Johnson, parked on the opposite side of U.S. 41 and walked across the highway in the dark to patronize HM Productions' teenage nightclub. This inadequate parking was a dangerous conditions which HM Productions knew or should have known existed. Id. at 938.

The Second District Court of Appeal concluded that under the common law, landowners have the duty to protect their invitees; this duty extends to cover a "wide spectrum of circumstances"; and this duty to protect invitees may extend to "nearby property if the landowner's foreseeable zone of risk extends beyond the boundaries of its property." Id. at 938. The Second District, therefore, reversed the summary judgment entered in HM Productions' favor and remanded for further proceedings.

The Fourth District Court of Appeal applied the same foreseeable zone of risk standard in two similar cases: Gunlock v. Gill Hotels Co., 622 So. 2d 163, 164 (Fla. 4th DCA 1993), and Almarante v. Art Institute of Fort Lauderdale, Inc., 921 So. 2d 703, 705 (Fla. 4th DCA 2006). In Gunlock, the Fourth District Court of Appeal reversed a dismissal which had been granted for failure to state a cause of action. In Gunlock, the hotel placed its buildings on both sides of highway A1A.

19

The decedent was struck and killed by a motorist as he crossed from the hotel's bar on the east side of A1A to his room located on the west side of A1A. The Fourth District concluded that the hotel "owed a duty to exercise reasonable care for the safety of its invitees in passing over the highway to and from appellee's hotel facilities." Gunlock, 622 So. 2d at 164. Similarly, in Almarante, the Fourth District concluded that the defendant, a private school, owed a duty of care to its students which could extend beyond the physical boundaries of the school's property if the defendant's conduct foreseeably created a risk of harm. Almarante, 921 So. 2d at 705.

As these cases reflect, in Florida, a landowner owes its invitees a duty of care, which may extend beyond the landowner's premises if the landowner has created a dangerous condition or a foreseeable zone of risk to its **invitees** that extends beyond the landowner's premises. But, the common thread in these cases is that the duty owed was limited to the landowner's **invitees**.

## C. Landowner liability to non-invitees

A landowner may also be subject to liability if it has permitted **conditions on its land** to extend outside the land which it knew or should have known created an unreasonable risk of harm to others not on its land.

In Hardin v. Jacksonville Terminal Co., 175 So. 226 (Fla. 1937), the issue before the Florida Supreme Court was whether Jacksonville Terminal Co. ("the

20

defendant") could be held liable to a pedestrian (Hardin) who was injured when he slipped and fell on a slick and slippery substance on the pavement he was walking on even though the pavement was not on the defendant's property nor owned, controlled, or maintained by the defendant. Apparently, the pavement had become slippery as a result of "liquids" running off of a retaining wall on the defendant's property and onto the street, which over time became slippery and unsafe. Id. at 226-27. The Florida Supreme Court concluded that an owner or the possessor of land may be subject to liability for bodily injuries caused to others off-premises by an artificial condition created thereon, such as changes caused by excavations, structures, and fillings. Id. at 227. However, since there were no allegations or facts to suggest that the defendant in this case had permitted a condition to occur on his land which he knew or should have known created an unreasonable risk of harm to others outside his land, the Florida Supreme Court held that the trial court correctly entered judgment in the defendant's favor. Id. at 228.

Although the conditions addressed in Hardin were artificial conditions, in 2001 the Florida Supreme Court extended the duty of care to commercial landowners who allow "natural" conditions, such as foliage and landscaping on their premises, to obstruct the view of motorists or pedestrians on the adjacent sidewalks and roadways. See Whitt v. Silverman, 788 So. 2d 210, 212 (Fla. 2001). Instead of applying the "agrarian rule," previously relied on in prior cases and

21

which provided that a landowner owed no duty to persons who are not on the landowner's property and who were therefore not responsible for any harm caused to them by natural conditions on the land, id. at 213, the Whitt Court applied the "foreseeable zone of risk" standard the Court had adopted in McCain v. Florida Power Corp., 593 So. 2d 500 (Fla. 1992). Whitt, at 222. Applying the foreseeable zone of risk standard, the Florida Supreme Court concluded that it was undisputed that the landowner had exclusive control over the foliage and landscaping on the business premises; it would not have been unduly burdensome for the landowner to have maintained the foliage to allow for safe ingress and egress from the property; and the failure to do so created a foreseeable zone of risk posing a general threat of harm toward patrons of the business as well as to the pedestrians and motorists using the abutting streets and sidewalks. Thus, the landowner had a duty of care. Id. at 222.

However, in Williams v. Davis, 974 So. 2d 1052, 1054 (Fla. 2007), the Florida Supreme Court declined to further extend the McCain foreseeable zone of risk standard to residential landowners who permit conditions on their land that negatively impact motorists or pedestrians who are off-premises unless those conditions actually extend into the public right-of-way so as to create a foreseeable hazard to traffic. For example, when a limb or branch of a tree extends past the owner's property and obstructs a traffic control sign, a landowner may be

tortiously liable. Id. at 1059. Specifically, the Florida Supreme Court stated:

> We conclude that these prior decisions can best be reconciled by a recognition that ordinarily a private residential landowner should be held accountable under the zone of risk analysis principles of McCain only when it can be determined that the landowner has permitted conditions on the land to extend into the public right-of-way so as to create a foreseeable hazard to traffic on the adjacent streets.

Id. at 1062.

In reaching this conclusion, the Court noted that "motorists in Florida have a continuing duty to use reasonable care on the roadways to avoid accidents and injury to themselves and others," id. at 1063, and this "continuing duty of motorists is not affected by our holding today." Id.; see also Birge v. Charron, 107 So. 3d 350, 361 n.19 (Fla. 2012) (holding that "drivers on Florida's roadways owe a duty of reasonable care not only to those driving in front of them, but also to those who are following, and all other individuals within the foreseeable zone of danger"); Bellere v. Madsen, 114 So. 2d 619, 621 (Fla. 1959) (concluding that "the driver of an automobile—a dangerous instrumentality—is charged with the responsibility of having his vehicle under control at all times, commensurate with the circumstances and the locale, and to maintain a sharp and attentive lookout in order to keep himself prepared to meet the exigencies of an emergency within reason and consistent with reasonable care and caution) (internal quotation omitted); Wallace v. Nat'l Fisheries, Inc., 768 So. 2d 17, 19 (Fla. 3d DCA 2000) (drivers have the duty to drive carefully and to avoid hitting other drivers).

This Court has consistently applied these principles. In Garcia v. City of Hialeah, 550 So. 2d 1158 (Fla. 3d DCA 1989), the plaintiff was injured as he exited a gas station and struck a vehicle on Okeechobee Road. The plaintiff claimed that his visibility was obscured by shrubbery. Id. at 1159. This Court noted that in those cases in which no invitee duty is involved, a "chance motorist" is injured on a public roadway while passing a landowner's property, and the accident is alleged to have been caused by shrubbery growing high but remaining solely on the landowner's property, the landowner is not liable for the resulting damages. Id. at 1159 n.1. Further, in Silver Palm Properties, Inc. v. Sullivan, 541 So. 2d 624, 624 (Fla. 3d DCA 1989), this Court also held that a landowner does not have a duty to retard the subterranean root growth of trees on his property which may extend beneath an adjacent public right-of-way. This Court concluded that because the County, not Silver Palm Properties, owned and maintained the roadway shoulder and surface in the area of the accident, and Silver Palm Properties had no right to alter or repair the surface of the roadway, and it had no duty to undertake root trenching or tree topping to retard subterranean root growth. Silver Palm, 941 So. 2d at 627.

Similarly, in Ruiz v. Taracomo Townhomes Condominium Ass'n, 525 So. 2d 445, 446 (Fla. 3d DCA 1988), this Court affirmed the trial court's order granting summary judgment in favor of the Association landowner. Id. In that

case, the plaintiff, who was driving on a street adjacent to the Association's property, was struck by a "phantom" motorist exiting the driveway to the Association. Id. This Court held that because it was undisputed that the "phantom" vehicle had an unobstructed view of the roadway where the plaintiff was driving, the Association had no liability. Id.

## D. **Application of the case law to the instant case**

The law in Florida is clear. Landowners owe their **invitees** a duty to use due care to maintain the premises in a reasonably safe condition and to protect them from foreseeable harm. Williams, 974 So. 2d at 1057 n.3 (citing Markowitz v. Helen Homes of Kendall Corp., 826 So. 2d 256, 259 (Fla. 2002)). This duty may extend off the landowner's premises if he has exercised some measure of control over the property he does not own or when he has impliedly encouraged his invitees to use the property of others.

The duties owed by a landowner "to those who come upon the property" differ from "those who do not come on the property." Williams, 974 So. 2d at 1056. A landowner may be subject to liability if he permits either artificial or natural conditions on his land to extend outside his premises which he knew or should have known created an unreasonable risk of harm to others not on his premises, commonly referred to as a foreseeable zone of risk.

Neither of those scenarios are present in this case. The plaintiff in the

instant case, Sewell, was not an invitee. She was a motorist driving on the public right-of-way adjacent to the defendant Racetrac's property. She was actually driving three lanes away from Racetrac's property when she allegedly swerved to avoid another motorist who she claims suddenly exited Racetrac's property, crossed two lanes of travel, and entered Sewell's lane of travel on the opposite side of the street. The break or cut in the concrete median that separates the eastbound and westbound lanes on that public right-of-way, which allowed the "phantom" motorist to cross the roadway at that point, was not owned or maintained by Racetrac or an extension of Racetrac's property, and Racetrac had no control over the median cut or any other traffic device on the public right-of-way. Nothing on Racetrac's property obstructed the view of its invitees or the public at large. This accident occurred either because an invitee of the gas station failed to yield the right-of-way or use due caution when exiting Racetrac's property, or because Sewell was driving too fast or was not herself using due caution as she approached the median cut.

There is no case cited by Sewell or in these opinions, and I have not found such a case, where liability has been extended to a landowner for a non-invitee who was injured where the allegedly dangerous condition or foreseeable zone of risk did not exist **on** the premises and then extend outside the premises and into the public right-of-way. Even <u>Thunderbird Drive-In Theatre, Inc. v. Reed</u>, 571 So. 2d

26

1341 (Fla. 4th DCA 1990), relied on by Sewell and the concurring, in part, and dissenting, in part opinion offered by my colleague, does not extend the duty under such a scenario. Thunderbird's negligence allegedly resulted from the **design and maintenance of the entrance to its theatre**, which caused its invitees, who were waiting to enter the theatre's premises, to back up onto Sunrise Boulevard and create a dangerous condition on the roadway. Id. at 1342-43. Thus, the dangerous condition was caused by a condition (the design and maintenance of Thunderbird's entrance) **on** Thunderbird's premises which **extended** onto the roadway. In the instant case, there is no claim that the design or maintenance of Racetrac's entrance/exit was faulty or that anything on its premises obstructed the visibility of any motorist or pedestrian entering or exiting its property or traveling on an adjacent sidewalk or roadway.

Although the "foreseeable zone of risk" standard is the standard to be applied in premises liability cases, that standard is subject to prescribed premises liability jurisprudence. To hold businesses liable for traffic conditions resulting from traffic control devices owned, maintained, and controlled by a county, a municipality, or the state would create a new liability not yet imposed in this state. Creation of new duties and responsibilities is a legislative function, not a judicial function. To extend liability as Sewell and the majority invite us to do, would make all commercial landowners the insurers of all invitees who fail to obey traffic

27

laws when entering or exiting the premises onto the public right-of-way and the insurers of all non-invitees who are injured when struck by an exiting patron, where neither the patron nor the passing motorist had an obstructed view.

Additionally, business owners do not have a duty to warn their invitees to use caution and to yield the right-of-way when exiting the business owner's premises. These duties have already been imposed upon all motorists by law. Racetrac also had no authority to prohibit its invitees from making a lawful exit onto Northeast 8th Street and using the opening in the median to make a left turn on Northeast 8th Street in order to travel east on Northeast 8th Street, because the median opening was created and approved by the County for that very purpose. Thus, Sewell's negligence claim, which was premised on Racetrac's duty to warn or to take corrective measures on its own property to lessen the danger posed by an invitee who fails to use proper caution when exiting its premises, was properly dismissed by the trial court.

## CONCLUSION

For the reasons expressed herein, I respectfully disagree with, and therefore dissent from, the panel conclusion reversing that portion of the trial court's order dismissing the portion of Sewell's negligence action against Racetrac that was founded on the theory that Racetrac had a duty to warn or to take other corrective action to lessen the dangers allegedly created by the use of the median opening on

28

the roadway adjacent to Racetrac's premises, but which was entirely owned, maintained, and controlled by the County.

**<u>Crystal Sewell v. Racetrac Petroleum, Inc.</u>**
**<u>3D16-1218</u>**

EMAS, J., concurring in part and dissenting in part.

**<u>INTRODUCTION</u>**

Appellant Crystal Sewell appealed three orders of the trial court:  1) the denial of her motion to plead punitive damages; 2) the denial of her motion to seek

29

damages for spoliation; and 3) the dismissal with prejudice of her one-count negligence action against Racetrac.

The majority affirmed the first two trial court orders described above, and I concur in that portion of the majority opinion. As to the trial court's dismissal of Sewell's negligence action, the majority affirmed in part and reversed in part. The majority held that the trial court erred in dismissing Sewell's negligence claim insofar as the claim was premised upon Racetrac's duty to manage signage and pavement markings on its own property. Notwithstanding this, the majority also held that Sewell may not seek to establish a negligence claim against Racetrac on her "main theory of liability": that Racetrac was negligent "for making an application to a government entity to effectuate a change in the roadway outside of [Racetrac's] property" (Maj. op. at *9).

I agree with the majority that the trial court erred in dismissing Sewell's negligence claim with regard to Racetrac's duty to manage signage and pavement markings on its own property. However, I dissent from the majority's holding that Sewell cannot allege and seek to prove a claim of negligence on the basis of Racetrac's actions with regard to the roadway changes.

The operative complaint alleged a single count for negligence against Racetrac. Nevertheless, the majority parses out individual factual allegations contained within that single count, and determines that, as a matter of law, the

30

allegations surrounding Racetrac's actions in seeking, procuring and installing the median cut cannot be properly pleaded or relied upon by Sewell for its negligence claim against Racetrac. It is this determination by the majority with which I take issue and from which I dissent. I write to further explain my reasoning.

## THE MAJORITY'S VIEW: THE MEDIAN CUT ALLEGATIONS SET FORTH A SEPARATE BUT IMPROPER THEORY OF LIABILITY

The majority determined that, while Sewell's complaint set forth a valid claim against Racetrac for negligence, the allegations regarding Racetrac's actions in seeking, obtaining approval for, and installing the median cut (the "Median Cut Allegations") cannot form a separate theory of liability for negligence. The majority opinion misapprehends the nature and purpose of these allegations. The Median Cut Allegations do not constitute an alternative theory of liability; rather, they serve to demonstrate that Racetrac knew of the dangerous nature of the condition it created by its own conduct and actions, and was aware of the foreseeable zone of risk this condition would pose to others. These allegations are relevant to, inter alia, the question of foreseeability and Racetrac's knowledge of the condition and its dangerous nature, which are inextricably intertwined with the determination of the existence and scope of the legal duty owed, and breached, by Racetrac.[2] I would reverse the dismissal order in its entirety, and therefore

---

[2] A determination of the existence of a duty is linked to the concept of foreseeability, and may arise from four general sources: legislative enactments or

31

respectfully dissent from the majority opinion to the extent that it affirms a portion of the trial court's order of dismissal.

**RELEVANT PROPOSITIONS OF LAW**

The following propositions of law are applicable to this discussion:

The duty element of negligence centers on whether the defendant's conduct foreseeably created a "zone of risk" that posed a general threat of harm to others. McCain v. Fla. Power Corp., 593 So. 2d 500, 502 (Fla. 1992). In McCain, the Florida Supreme Court recognized that, in Florida, "a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." Id. The McCain Court noted that one who creates a risk must exercise prudent foresight when others may be injured, and "this requirement of reasonable, general foresight is the core of the duty element." Id. at 503. "The trial courts

---

administrative regulations; judicial interpretations of such enactments or regulations; other judicial precedent; and a duty arising from the general facts of the case. McCain v. Fla. Power Corp., 593 So. 2d 500, 503 n. 2 (Fla. 1992).

The allegations are also relevant to a determination of whether, in light of its own actions and its knowledge of the dangerous condition it created, Racetrac breached a legal duty to exercise reasonable care. See Clay Elec. Co-op., Inc. v. Johnson, 873 So. 2d 1182, 1185 (Fla. 2003) (a traditional negligence claim is comprised of four elements: legal duty, breach of that duty by failure to exercise reasonable care, proximate cause, and actual loss or damage). The concept of foreseeability is relevant to a determination of both legal duty and proximate cause. See discussion *infra* at *14-15.

cannot find a lack of duty if a foreseeable zone of risk more likely than not was created by the defendant." Id.

If a landowner creates a condition that he knows or should know is dangerous, a duty is imposed by which that landowner must act either to lessen the danger, or to warn the public of that danger. As the Florida Supreme Court has recognized and reaffirmed: "Where a defendant's conduct creates a *foreseeable zone of risk*, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." McCain, 593 So. 2d at 503 (quoting Kaisner v. Kolb, 543 So. 2d 732, 735 (Fla. 1989)).

The duty of care owed by a landowner is commensurate with the foreseeable zone of risk created by the actions and conduct of that landowner. Given that the property at issue is a gas station, we look to cases that discuss this concept in the context of a commercial landowner. [3]

---

[3] For this very reason, the majority's reliance on Williams v. Davis, 974 So. 2d 1052 (Fla. 2007) is simply misplaced. That case involved a *residential* landowner, not a *commercial* landowner. The holding in Williams is inapplicable to the question presented in this case: does Racetrac, a commercial landowner, owe a duty of reasonable care for a dangerous condition it created (and an injury it caused) beyond the physical boundaries of its property?

The significance of the distinction between a residential landowner's duty and a commercial landowner's duty is fairly self-evident: a commercial landowner's success is directly dependent on customers coming into its business and purchasing its goods or services. To the extent that, by its actions, the business expressly or implicitly invites customers onto its property, the commercial landowner has a

The McCain zone of risk analysis has been applied in determining the existence of a duty of a commercial landowner when the creation of a foreseeable zone of risk on the commercial property causes an injury off the property. For example, in Whitt v. Silverman, 788 So. 2d 210 (Fla. 2001), two pedestrians walking on the sidewalk abutting a gas station were struck by a vehicle exiting that gas station. The driver of the vehicle alleged he could not see the pedestrians because his view was obstructed by dense foliage growing on the gas station property.

The Court noted that the property involved was a gas station, a commercial business "which by its very nature involves a continuous flow of traffic entering and exiting the premises for the commercial benefit of the landowners." Id. at 222. It was undisputed that the landowners had exclusive control over the foliage on the property, and it was not unduly burdensome to have maintained the foliage consistent with a safe egress and ingress into and out of the property. The question was whether the commercial landowner owed a duty of care to persons who might

corresponding duty which may extend beyond the precise boundaries of the commercial property "to include approaches to the premises which are open to invitees in connection with their business on the premises, and which are so located and constituted as to represent an invitation to visit the place of business and to use such means of approach." IRE Fla. Income Partners, Ltd. v. Scott, 381 So. 2d 1114, 1117 (Fla. 1st DCA 1979). See also Garcia v. City of Hialeah, 550 So. 2d 1158, 1159 (Fla. 3d DCA 1989) (holding that a commercial landowner owed a duty to provide reasonably safe ingress and egress to business invitees using his gasoline station).

be injured as a result of natural conditions (e.g., landscaping) existing on the landowner's property, even where the injury occurs on the sidewalk immediately abutting the commercial property. The <u>Whitt</u> Court, applying the <u>McCain</u> "foreseeable zone of risk" analysis, concluded that the commercial landowner owed a duty of care to the pedestrians, even though the foliage was a natural condition and even though the injury occurred beyond the property's boundaries. The <u>Whitt</u> Court acknowledged that a case-by-case factual analysis is required to determine whether a commercial landowner owes a duty of care under these circumstances.

Further, a commercial landowner has a duty to provide invitees with safe ingress into, and egress from, its commercial premises. As recognized in <u>Thompson v. Gallo</u>, 680 So. 2d 441, 443 (Fla. 1st DCA 1996) (quoting <u>IRE Fla. Income Partners, Ltd. v. Scott</u>, 381 So. 2d 1114, 1117 (Fla. 1st DCA 1979)):

> The duty to keep the premises safe for invitees extends to all portions of the premises that are included in the invitation and that are necessary or convenient for the invitee to visit or use in the course of the business for which the invitation was extended.... "The duty extends to approaches to the premises which are open to invitees in connection with their business on the premises, and which are so located and constituted as to represent an invitation to visit the place of business and to use such means of approach."

The commercial landowner's duty extends to approaches to the premises which are located in such a way as to represent an invitation to visit the place of business and to use such means of approach. <u>See</u> <u>Garcia v. City of Hialeah</u>, 550

So. 2d 1158, 1159 (Fla. 3d DCA 1989) (holding that liability can be "derived from the fact that [the commercial landowner] owed a duty to provide reasonably safe ingress and egress to business invitees using his gasoline station.")

A commercial landowner abutting a public highway may owe a duty to passing motorists for creating a dangerous condition on the highway. Florida Specialty, Inc. v. H 2 Ology, Inc., 742 So. 2d 523, 526 (Fla. 1st DCA 1999) (reversing dismissal order where complaint sufficiently alleged the existence of a duty by alleging that the landowner's actions in discharging corrosive solution onto an abutting roadway created a foreseeable zone of risk to employees of neighboring businesses driving on the roadway to get to and from work).

Finally, a commercial landowner who creates a foreseeable zone of risk outside of its premises has a duty to lessen that risk or see that sufficient precautions are taken to protect others from the harm that the risk poses. In Thunderbird Drive-In Theatre, Inc. v. Reed By and Through Reed, 571 So. 2d 1341 (Fla. 4th DCA 1990) (receded from on other grounds in Love v. Garcia, 611 So. 2d 1270 (Fla. 4th DCA 1992)), the Fourth District affirmed a jury verdict in favor of a driver injured by the negligence of a drive-in theater that failed to adequately control traffic congestion caused by the theater's operations, resulting in an auto accident. The drive-in theater had seven movie screens and, on the day

of the accident, seven different movies commenced simultaneously, including an "early bird special" for those arriving between 7:30 and 8:00 p.m.

A motorcyclist (Reed) collided with the driver of a vehicle (Coyman) who had negligently attempted to enter the Thunderbird drive-in theater. Coyman was driving eastbound, moved into the left turn lane, and was waiting to turn into the theater entrance. However, there was a long line of cars in the right lane of westbound traffic also waiting to turn into the theater. Coyman saw what he thought was an opening into the theater entrance and began making his left turn crossing into the three lanes of the westbound traffic. However, he was forced to stop in the middle of the westbound lanes because a car in the right lane of westbound traffic moved into the theater entrance, blocking Coyman from entering into that space. This left Coyman's vehicle exposed and in the path of Reed's motorcycle (traveling in a westbound lane) which could not stop in time, resulting in a collision.

Reed sued Coyman as well as Thunderbird Drive-In, contending, inter alia, that the theater was negligent in the design and maintenance of its entrance to the theater; that this negligence caused traffic to build up on the abutting highway, creating a known dangerous condition; that the theater failed to lessen this dangerous condition (for example, by hiring additional police to control traffic); and that such negligence was a proximate cause of the accident.

The theater argued, inter alia, that it had no notice of any dangerous condition (no prior similar accidents had occurred), and that a slowdown in traffic by the congregation of its customers in the highway could not serve to impose liability on the theater as the property owner.

The jury returned a verdict which found Thunderbird (as well as Coyman and Reed) liable. Thunderbird appealed and the Fourth District affirmed, determining that the theater could be held liable for the dangerous condition it created, even though the dangerous condition was created on the highway abutting the theater's property. The court noted that while the question of foreseeability (as it relates to the issue of proximate cause) was a question to be answered by the jury, the question of Thunderbird's duty was clear:

> Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses. See Stevens v. Jefferson, 436 So.2d 33, 35 (Fla.1983) (citing Crislip v. Holland, 401 So.2d 1115, 1117 (Fla. 4th DCA), review denied sub nom. City of Fort Pierce v. Crislip, 411 So.2d 380 (Fla.1981)).

Id. at 1343-44 (quoting Kaisner, 543 So. 2d at 735-36).

## THE "MEDIAN CUT ALLEGATIONS" OF THE COMPLAINT

As recognized by the majority, the trial court disposed of Sewell's complaint at the motion to dismiss stage. As a result, both the trial court and this court must accept all well-pleaded allegations of the complaint as true, as well as reasonable

38

inferences arising from those allegations. In short, the allegations and inferences therefrom must be construed in a light most favorable to the plaintiff. See The Florida Bar v. Greene, 926 So. 2d 1195, 1199 (Fla. 2006); Rolle v. Cold Stone Creamery, Inc., 212 So. 3d 1073 (Fla. 3d DCA 2017). With that (and the previously-discussed legal propositions) in mind, we turn to the specific allegations of complaint that are at issue in this discussion, the so-called "Median Cut Allegations":

1. Racetrac entered into a contract for the purchase of unimproved property located on the north side of Campbell Drive in Homestead, Florida. Racetrac intended to build a gas station at the location. However, at the time of the purchase, the portion of Campbell Drive abutting the property contained an unbroken concrete median separating eastbound and westbound traffic. As a result, only westbound traffic would be able to access the property. The median prevented eastbound traffic from making a left-hand turn to enter the property. The existing median also prevented vehicles from exiting the property to proceed eastbound; instead vehicles could proceed only westbound on Campbell Drive.

2. Racetrac desired to build a "full access" station—one that would allow both eastbound and westbound vehicles to access the gas station, and would permit exiting vehicles to access both the eastbound and westbound lanes of Campbell Drive.

3. Racetrac determined it would not purchase the property (and construct a gas station) unless a "median cut" was made in Campbell Drive to create the desired full access for both eastbound and westbound travelers. The

purchase contract included a clause that the purchase was contingent on Racetrac obtaining "approval from all necessary Governmental agencies to construct a median cut on Campbell Drive . . . designed to allow direct ingress and egress between [Racetrac] and the Eastbound lane of Campbell Drive [allowing for left turns into and out of Racetrac], without necessitating a u-turn."

4. In order to make a median cut in Campbell Drive, Racetrac required approval from Miami-Dade County. In order to obtain a permit for the median cut, Racetrac was required to conduct a traffic study and submit to Miami-Dade County a projection of: a) the volume of traffic which would be generated by the existence of the gas station; and b) the effect this projected traffic volume would have on the surrounding roadways.

5. Thereafter, and in furtherance of its intent to acquire a "full access" gas station, Racetrac knowingly submitted false and misleading traffic projections to Miami-Dade County in order to obtain approval for the median cut in Campbell Drive.

6. Racetrac knew, from its own internal data and other sources, that the projections it provided to Miami-Dade County drastically understated the traffic volume its gas station would actually generate.

7. However, Racetrac also knew that these false and misleading projections (which greatly understated the traffic volume and associated impact generated by the gas station) greatly increased Racetrac's chances of obtaining approval for the median cut and its desired "full access" gas station.

8. Based upon these false and misleading projections, the County approved Racetrac's request for a median cut in Campbell Drive, and Racetrac

40

thereafter constructed its gas station with a median cut, thereby permitting full access by eastbound and westbound traffic on Campbell Drive.

9. Had Racetrac provided Miami-Dade County with accurate and valid projections of the traffic impact generated by the gas station, no median cut would have been permitted.

10. The presence of the median cut in that portion of Campbell Drive abutting the gas station created a foreseeable and undue risk of harm to the motoring public.

11. Racetrac knew or should have known that the opening of the median to permit "full access" (ingress and egress) to and from the gas station created an undue risk of harm to the motoring public.

12. Racetrac knew or should have known that the median cut to allow "full access" would create "18 major conflict points" (by allowing left turns into and out of Racetrac through the median cut), posing an undue risk of harm to the motoring public that would not be present but for the placement of the median cut.

13. Racetrac knew or should have known that the design, construction, or maintenance of the gas station and median cut posed an undue risk of harm to the motoring public because the median cut was too narrow for cars to safely stop in the median when exiting Racetrac and turning left onto Campbell Drive. As a result, vehicles exiting Racetrac would have to "rapidly and perpendicularly cross the heavily-traveled fast moving westbound traffic lanes," drive through the median break without stopping, and "suddenly intrude" into the eastbound traffic lanes.

14. Prior similar accidents at the accident site placed Racetrac on notice that the median cut created a zone of risk (for motorists like Sewell) which extended beyond the physical boundaries of Racetrac's gas station.

41

## DISCUSSION

The majority opinion characterizes the Median Cut Allegations as the main theory of liability, and concludes that "[t]he cases cited by Sewell do not support her main legal theory that Racetrac's petition to open the concrete median in the roadway outside of its property rises to the level of a tort." Maj. op. at *9. The majority opinion then concludes: "[W]e hold that a person who petitions the government for a road improvement outside of his or her property has no legal duty to guard against the government making a decision that will create an allegedly unreasonably dangerous road condition." Id. at *10. However, Sewell's one-count complaint is for simple negligence and is grounded upon the allegation that Racetrac, by placing a median cut in the highway abutting its commercial property, knowingly creating a dangerous condition and a foreseeable zone of risk of injury to others. This case is most assuredly not, as the majority apparently perceives, a tort grounded upon Racetrac's petitioning for a median cut, or Miami-Dade County's actions in approving the permit for the median cut. Rather, under the well-pleaded allegations, Racetrac placed a cut in the median of the highway which (as detailed in the Median Cut Allegations) *Racetrac knew or should have known created a foreseeable and undue risk of harm*. This knowledge is evidenced by the allegation that, in an effort to ensure the planned gas station permitted "full access" to and from its commercial property, Racetrac knowingly

42

submitted a traffic study containing false and misleading projections, to obtain approval for a median cut in the abutting highway.

The Median Cut Allegations are relevant because they tend to show that Racetrac knew from the inception the sought-after median cut would be dangerous and would pose a foreseeable risk of harm to the motoring public attempting to enter or exit its gas station through the median cut (or to others injured by motorists attempting to enter or exit its gas station).  "Relevant evidence is evidence tending to prove or disprove a material fact."  § 90.402, Fla. Stat. (2017).

Therefore, while Sewell may indeed be able to prove her simple negligence claim by relying on the remaining allegations of her operative complaint (which, as the majority holds, states a valid cause of action), this does not and should not foreclose Sewell from also relying on the Median Cut Allegations, as they bear on Racetrac's knowledge of the condition and on the question of foreseeability as it relates to the issues of duty and proximate cause.[4]

Our sister court, in Almarante v. Art Inst. of Fort Lauderdale, Inc., 921 So. 2d 703, 705 (Fla. 4th DCA 2006), held that a landowner can be held liable in negligence where it creates a dangerous condition beyond the physical boundaries

---

[4] Foreseeability arises in two contexts: in determining the existence of a duty of care, the trial court must consider whether the conduct of the defendant created a foreseeable zone of risk.  McCain, 593 So. 2d at 504.  As it relates to proximate cause, the question of foreseeability is generally for the factfinder to consider and resolve.  Id.  See also Fla. Power & Light Co. v. Periera, 705 So. 2d 1359, 1361 (Fla. 1998).

of its premises. The defendant in that case, a private school, built two separate dormitory buildings, one on each side of a busy highway. One of the two buildings contained the school's common facilities, housing the cafeteria, mail center, and bus stop. The other building housed students, who were routinely required to cross the busy highway to access the services and facilities in the other building. However, the school did not install a pedestrian signal, cross-walk, bridge, or other safety device within the general vicinity of the two buildings to facilitate a safe crossing of the highway. Two previous pedestrian accidents put the school on notice as to the dangerous condition created by the need to cross the busy highway between the two buildings. In seeking the installation of appropriate safety devices between the buildings from the Florida Department of Transportation (DOT), the DOT advised the school that it was the school's responsibility to conduct a traffic study before the DOT would install the traffic signal at the school's expense.

The plaintiff, a student residing in one of the dormitory buildings, was hit by a vehicle when crossing the highway. The school contended that it had "no legal duty under Florida law to provide reasonably safe passage across a public highway not owned, maintained, or controlled [by the defendant]." Id. at 704. The trial court agreed and dismissed the action with prejudice.

On appeal, the Fourth District reversed. In doing so, the court applied McCain to determine whether the school foreseeably created a zone of risk of harm

44

to pedestrians (i.e., the students who crossed the street between the two buildings). Id. at 705. In its analysis, the court cited to its decision in Gunlock v. Gill Hotels Co., Inc., 622 So. 2d 163, 164 (Fla. 4th DCA 1993), which held that "a landowner's conduct can give rise to a zone of risk extending beyond the physical boundaries of his property when harm reaching outside those boundaries is foreseeable."[5] The court in Almarante reversed the lower court's dismissal order, holding that the school's decision to place its dormitory buildings on both sides of a busy highway, requiring its students to cross the highway regularly for meals and other student functions, created a foreseeable zone of danger for its students. Almarante, 921 So. 2d at 705.

I find helpful parallels between the facts in Almarante and the allegations in the instant case. Like the dangerous condition and foreseeable zone of risk created by the school when it constructed buildings on opposite sides of a highway without taking any steps to ensure that students could safely cross the highway to access the two buildings, the placement of the median cut in the highway to secure "full access" to Racetrac's gas station was a dangerous condition, creating a foreseeable zone of risk to motorists. Moreover, like the students in Almarante who were

---

[5] The Gunlock court, in reversing a trial court's order dismissing a cause of action under similar circumstances, found that a commercial landowner whose hotel property encompassed a bar on one side of the highway and hotel rooms on the other side of the highway, owed a duty to its invitees in passing over the highway to and from the hotel's facilities. Gunlock, 622 So. 2d at 164.

required to cross the highway to utilize the services, and participate in activities, offered by the school, Racetrac's invitees were required to use the median cut for ingress and egress when making left turns into and out of Racetrac. Sewell has properly pleaded that Racetrac's actions created a foreseeable zone of risk and that Racetrac therefore owed a duty, to those within the foreseeable zone of risk, to either lessen the risk of harm or to warn of the dangerous condition it created on the highway abutting its commercial property.

For these reasons, I respectfully concur in part and dissent in part, and would reverse in its entirety that portion of the trial court's order which dismisses with prejudice Sewell's negligence claim.